[No. F030423. Fifth Dist. Mar. 16, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERTA RITA CASTRO, Defendant and Appellant.

[No. F031668. Fifth Dist. Mar. 16, 2000.]

In re ROBERTA RITA CASTRO on Habeas Corpus.

## COUNSEL

Paul Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant and for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and Matthew L. Cate, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KALASHIAN, J.**\*—In this appeal, appellant Roberta Rita Castro (hereafter Roberta or appellant) asserts that the trial court erred when it refused to appoint the director of the regional center for the developmentally disabled

---

*Judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

to evaluate her pursuant to Penal Code[1] section 1369; counsel rendered ineffective assistance; and erroneous rulings on evidentiary issues were made by the trial court. In the habeas corpus petition, appellant asserts numerous grounds of ineffective assistance of counsel by both trial counsel. The habeas corpus petition also asserts that: (1) Huffman provided erroneous legal advice to appellant to induce her to accept the plea; and (2) Huffman violated her duty of loyalty to her client by testifying for the prosecution at the hearing to withdraw the plea.

For the reasons that follow, we hold that there was substantial evidence that warranted the appointment of the director of the regional center, and failure to do so deprived the trial court of jurisdiction to proceed. We therefore reverse.

## FACTS AND PROCEEDINGS

On January 24, 1997, appellant's younger sister, 18-year-old Amada Castro (hereafter Amada),[2] lived in a two-bedroom apartment in Bakersfield, California, with her two daughters, her 16-year-old boyfriend Ricardo H., Ricardo H's. brother Daniel, and the brothers' mother Raquel Bautista. At that time, Amada's daughter, Yolanda, was one year old; her daughter Esperanza was two months old.[3] Ricardo H. is the children's father. Neither Amada nor Ricardo H. had completed or were attending high school. Amada claimed both children shared a bedroom with her and her boyfriend. The other bedroom was used by Daniel.

Appellant, whose 20th birthday was six days before the incident, had been residing in the apartment for three days. Appellant was an 11th grade special education student at the time of the incident. On January 24, Amada left the apartment around noontime with her daughter Yolanda and Bautista. Ricardo H. was in custody in Juvenile Hall for assaulting Amada, and Amada and Bautista planned to attend Ricardo H.'s scheduled 1:00 p.m. court appearance that afternoon. Amada left her infant daughter alone with appellant.

According to Amada, when she and Yolanda returned home around 6:00 p.m. that evening, the baby was in good condition.[4] Amada's and Roberta's father, Baltazar Castro, was at the apartment, but left shortly after Amada

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] Because appellant and her family members share the same last name, we refer to them by first name to avoid confusion. No disrespect is intended.

[3] Due to appellant's plea of no contest, there was no trial in this case. As such, the facts are extracted from the preliminary hearing transcript and police reports.

[4] Apparently Bautista did not return home with them.

returned home. Upon returning home, Amada fed the baby, then laid her down on blankets on the living room floor, which was carpeted. Amada then went upstairs with her other daughter, Yolanda. Amada told officers that the infant appeared and acted normal at that time. A few minutes later, appellant ran upstairs and told Amada that the baby was not breathing. Amada ran downstairs to find the infant having difficulty breathing and pale in appearance. Amada began to administer CPR and told appellant to call 911 for help. Because the nearest telephone was a block away, Roberta left the apartment to call for help.

When officers arrived in response to the 911 call, Roberta was outside the apartment waiting for them. Amada estimated that officers and paramedics arrived approximately two minutes after Roberta left to make the telephone call. The officers and paramedics who responded to the call immediately noticed numerous bruises and marks on the infant's face, and a large lump on the right side of the baby's head. The infant was transported to Kern Medical Center.

The medical examination revealed that Esperanza had a skull fracture on the right side of her head just behind and above the right ear. There was bleeding into the cerebral cavity and the infant needed a respirator to breathe. The injuries were consistent with blunt force trauma, which could have been caused by a blow to the head with a blunt object, or by slamming the infant's head against a blunt object such as a wall.

The officers were told at the hospital that Esperanza was born two months prematurely, and was approximately two months old at the time of the incident. Amada also told officers that Esperanza had been sick during the past month. Officers also were aware that Child Protective Services had visited Amada in the past, most recently two weeks before the incident.

The officers then asked Amada to accompany them to the police station for a further interview. Before heading to the station, the officers went to the apartment with Amada and asked Amada to request that Roberta accompany her to the station house for "moral support." The officers then drove both Amada and Roberta to the station house to be interviewed. Once at the station house, the officers asked Roberta if they could talk to her; when she responded "yes," they took her to an interview room and surreptitiously recorded the interview.

During the interview, Roberta stated that she had lived at the apartment for "[q]uite a while," although Amada told officers Roberta had been at the apartment for only three days.

When the officers asked what had happened at the apartment, Roberta told them she had been in the kitchen and when she went into the living room, she saw that the baby was "lying stiff, she wasn't moving her body." Roberta was scared and ran to get her sister. Officers told Roberta that the baby's condition was critical and told her they didn't know if the baby had been dropped, struck, or if something fell on the baby. The officers also told Roberta that they were aware that Roberta loved the baby and was "sorry for what happened."

Roberta began to cry at this point, and officers told her that they knew she was "scared," but she had "to get this off her chest" and "tell us what happened." After these remarks from the officers, Roberta said that the baby slipped out of her arms. At this point, the officers noted in their report that they believed Roberta's actions were possibly criminal, so they read the *Miranda*[5] rights to her and asked Roberta if she wanted to continue to answer questions. Roberta shook her head "in the negative" and said "No" in response to the question. Despite this, officers continued to question her in order to get to the "bottom of what happened."[6]

In response to the continued questioning, Roberta told officers that she was standing up and holding the baby when the baby slipped out of her arms and fell to the floor. She didn't tell anyone about what had happened because she was "scared." The officers ended the interview by telling Roberta that she had to go to Amada and "tell her what happened." The officers then took her to the interview room where Amada was waiting and again surreptitiously recorded the conversation. During the conversation, Roberta acknowledged to Amada that she had dropped the baby.

At this point, officers contacted Valley Children's Hospital, where the baby had been transported for treatment, to obtain an opinion as to how the injuries were sustained. The attending physician advised them that the injuries were not consistent with being dropped onto a carpeted floor. After obtaining this information, the officers again interviewed Roberta and surreptitiously recorded the interview.

During the second interview, the officers claimed Roberta showed great "remorse" and Roberta explained that she had been angry over the situation between Amada and Ricardo H. When Amada returned home that day, she had informed Roberta that she was not willing to press charges against

---

[5]*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

[6]We are extremely troubled by the conduct of the officers, which arguably constitutes a violation of Roberta's *Miranda* rights. We would have expected defense counsel, at a minimum, to have filed a motion to suppress.

Ricardo H. for the assault; this made Roberta angry. After telling Roberta this information, Amada went upstairs. At this point, the baby began to cry and Roberta picked the infant up and "struck the baby on the carpeted living room floor three times."

After this statement, Roberta said she wanted to see her sister but was afraid to tell her what had happened. The officers told Roberta that she, not somebody else, had to tell Amada what had happened. Officers then took Roberta to Amada and surreptitiously recorded the conversation wherein Roberta admitted hitting the infant on the floor. Officers then told Baltazar that Roberta had confessed; Baltazar asked to see his daughter. Officers placed Baltazar and Roberta in an interrogation room and surreptitiously recorded their conversation.

On January 31, 1997, Amada authorized Valley Children's Hospital to take Esperanza off life support systems. The infant died that day.

*Legal Proceedings*

On January 28, 1997, a complaint was filed against appellant alleging felony child endangerment (§ 273a, subd. (a)) and infliction of great bodily injury (§ 12022.7, subds. (a) and (b)). A preliminary hearing was held on February 10, 1997, at the conclusion of which defense counsel requested the appointment of a psychotherapist pursuant to Evidence Code section 1017.[7] Dr. James Sanderson was appointed to examine the appellant.

On or about February 18, 1997, an information charging appellant with premeditated murder (§ 187, count 1), and assault of a child under age eight, resulting in death (§ 273a, subd. (b), count 2), was filed.

At the arraignment on February 19, 1997, defense counsel entered a plea of not guilty on behalf of appellant.

Dr. Sanderson examined appellant and submitted a written report to defense counsel. Because Dr. Sanderson's report indicated appellant was

---

[7]Evidence Code section 1017, subdivision (a) provides: "There is no privilege under this article if the psychotherapist is appointed by order of a court to examine the patient, but this exception does not apply where the psychotherapist is appointed by order of the court upon the request of the lawyer for the defendant in a criminal proceeding in order to provide the lawyer with information needed so that he or she may advise the defendant whether to enter or withdraw a plea based on insanity or to present a defense based on his or her mental or emotional condition."

developmentally disabled, defense counsel filed a motion pursuant to sections 1368[8] and 1369,[9] which requested that the director of the regional center for the developmentally disabled be appointed to examine appellant pursuant to section 1369, subdivision (a). Defense counsel informed the court that appellant would never admit that she does not understand because of "some stigma evidently that has been placed on her with admitting that she does not understand." The trial court responded that its own observation of appellant indicated she acted "in a lot of ways that are perfectly normal for a person standing in court with an attorney beside her."

The trial court denied the motion without prejudice, pending submission of a further declaration from defense counsel. Defense counsel filed the further declaration. Attached to defense counsel's supplemental declaration were records from the State of California, Department of Rehabilitation (hereafter Department of Rehabilitation) reflecting that appellant had a developmental disability classified as "most severe."

At the next hearing defense counsel renewed the request that the director of the regional center be appointed to examine appellant pursuant to section 1369, subdivision (a). The trial court suspended proceedings pursuant to section 1368, but refused to appoint the director of the regional center to examine the appellant, and instead appointed Dr. Luis Velosa to examine appellant pursuant to section 1368, subdivision (a).

The trial court reviewed the report of Dr. Velosa, which report stated that appellant had an unspecified learning disability, but no psychiatric disorder. The matter was submitted solely on the basis of Velosa's report. Based upon Dr. Velosa's report, the trial court reinstated criminal proceedings.

On July 30, 1997, the information was amended to allege a charge of second degree murder, in addition to the other charges. Pursuant to a plea

---

[8]Section 1368, subdivision (b) provides: "If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court."

[9]Section 1369, subdivision (a) provides: "The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant. In any case where the defendant or the defendant's counsel informs the court that the defendant is not seeking a finding of mental incompetence, the court shall appoint two psychiatrists, licensed psychologists, or a combination thereof. One of the psychiatrists or licensed psychologists may be named by the defense and one may be named by the prosecution. If it is suspected the defendant is developmentally disabled, the court shall appoint the director of the regional center for the developmentally disabled established under Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code, or the designee of the director, to examine the defendant. The court may order the developmentally disabled defendant to be confined for examination in a residential facility or state hospital."

agreement, appellant entered a plea of no contest to the charge of second degree murder in exchange for dismissal of the other charges.

On August 27, 1997, appellant's trial counsel, Huffman, notified the trial court that a conflict had arisen between herself and her client, together with appellant's family, and requested permission to withdraw as counsel for appellant. Counsel also notified the court that appellant desired to withdraw her plea. The trial court denied the request to withdraw, but appointed another attorney, Childers, to represent appellant in the motion to withdraw the plea.

Attorney Childers filed a new motion to suspend proceedings pursuant to section 1368, and to have appellant evaluated pursuant to section 1369, subdivision (a), on the grounds that Dr. Velosa's report was inadequate and incomplete and that appellant was incompetent to assist in her own defense. Again, the trial court suspended proceedings, but did not appoint the director of the regional center to evaluate appellant. Instead, Dr. Richard Burdick, a psychiatrist, was appointed to evaluate appellant.

On October 9, 1997, the trial court considered the report of Dr. Burdick. Dr. Burdick's report concluded that appellant had no "psychiatric disease" but did have an unspecified learning disability of some type. Burdick concluded that appellant was "able to understand the nature and purpose of the proceedings" taken against her. Based upon Dr. Burdick's report, the trial court reinstituted criminal proceedings.

Appellant filed a motion to withdraw her plea. The motion sought to withdraw the plea on the grounds that appellant's developmental disability was such that she was unable to understand the consequences of her plea. Testifying in support of this motion was Dr. Emerick, a clinical psychologist, who examined appellant at the request of her attorney. Dr. Emerick administered a nonverbal intelligence test and determined that appellant had the intelligence of an average six-to-seven-year-old—this test placed her intelligence quotient (IQ) between 55 and 65; persons with this IQ level were previously denominated as "morons." It was also Dr. Emerick's opinion that appellant was not capable of cooperating with an attorney and assisting in her own defense. Further, the doctor opined that appellant had not been competent to enter a plea on July 30, 1997. Dr. Velosa testified on behalf of the prosecution that while appellant had a learning disability, he found no evidence of mental retardation at the time of his examination of her, which lasted one hour. He did not administer a psychological or intelligence test. Appellant's mother and father also testified. After considering this evidence, the trial court denied the motion.

Evidence in mitigation was submitted by the defense, and evidence in aggravation was submitted by the prosecution. Attached to the statement in mitigation were numerous documents from the school district reflecting that their testing of Roberta indicated she functioned at the level of a second or third grader; and that by seventh grade she had been identified as mentally retarded. In addition, state Department of Rehabilitation documents were attached, including the evaluation of Dr. Richard Starrett, dated August 12, 1996. Dr. Starrett's testing found Roberta to have an overall IQ of 61, with the reading and writing ability of a second grader. Roberta was classified as mentally retarded with "neurological deficits."

Appellant was sentenced on March 13, 1998, to a term of 15 years to life in state prison.

A timely notice of appeal was filed and a certificate of probable cause was issued by the Kern County Superior Court.

Appellate counsel filed a request to expand his appointment to include the filing of a petition for writ of habeas corpus on behalf of appellant and this court granted the request. This court consolidated the appeal and the petition for writ of habeas corpus.

## DISCUSSION

### A. *The Law*

Appellant asserts that section 1369 required the trial court to appoint the director of the regional center for the developmentally disabled to evaluate Roberta before ruling on her competency to stand trial. Respondent asserts the trial court properly denied the request based upon its own observation that Roberta's conduct in court was appropriate; and alternatively, that failure to appoint the regional director did not result in a miscarriage of justice under article VI, section 13 of the California Constitution. We will conclude that the trial court's failure to appoint the director of the regional center for the developmentally disabled to evaluate Roberta deprived the trial court of jurisdiction to proceed. Section 1367, subdivision (a), provides: "A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." The plain language of the statute provides that mental incompetence may be the result of a mental disorder *or* a developmental disability.

Pursuant to section 1370.1, subdivision (a)(1)(H), "developmental disability" is defined to include mental retardation.

This statute embodies the federal constitutional principle that a defendant "may not be put to trial unless he ' "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him." ' [Citation.]" (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354 [116 S.Ct. 1373, 1377, 134 L.Ed.2d 498].) Whether a person is competent to stand trial is a jurisdictional question, and cannot be waived by the defendant or counsel. (*People v. Pennington* (1967) 66 Cal.2d 508, 521 [58 Cal.Rptr. 374, 426 P.2d 942].)

The principles in section 1367 are implemented by section 1368, which provides:

"(a) If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is not represented by counsel, the court shall appoint counsel. At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time.

"(b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court.

"(c) Except as provided in Section 1368.1, when an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined.

"If a jury has been impaneled and sworn to try the defendant, the jury shall be discharged only if it appears to the court that undue hardship to the jurors would result if the jury is retained on call.

"If the defendant is declared mentally incompetent, the jury shall be discharged."

██ Although section 1368, subdivision (a), refers to a doubt that arises "in the mind of the judge as to the mental competence of the defendant," case law interpreting this subdivision establishes that when the court becomes aware of substantial evidence which objectively generates a doubt about whether the defendant is competent to stand trial, the trial court must on its own motion declare a doubt and suspend proceedings even if the trial judge's personal observations lead the judge to a belief the defendant is competent. (*People v. Pennington, supra,* 66 Cal.2d at p. 518; *People v. Jones* (1991) 53 Cal.3d 1115, 1153 [282 Cal.Rptr. 465, 811 P.2d 757].) Due process requirements are not satisfied if the court merely takes the " 'evidence to guide him in determining if he should declare the existence of a "doubt" ' " as to the defendant's competency; the trial court has no discretion on whether or not to order a competency hearing once there exists substantial evidence giving rise to a doubt regarding competency. (*People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 69 [2 Cal.Rptr.2d 389, 820 P.2d 613] (*Marks*).) If a trial court proceeds without holding a competency hearing, the defendant has been deprived of his or her due process right to a fair trial, the trial court has acted in excess of its jurisdiction, and the judgment is a nullity. (*Id.* at pp. 70-71; *People v. Hale* (1988) 44 Cal.3d 531, 541 [244 Cal.Rptr. 114, 749 P.2d 769].)

██ Substantial evidence of mental incompetence is evidence that raises a reasonable doubt on the issue. (*People v. Alvarez* (1996) 14 Cal.4th 155, 211 [58 Cal.Rptr.2d 385, 926 P.2d 365].) In determining whether there is substantial evidence of incompetence, a court must consider all of the relevant circumstances, including counsel's opinion. (*People v. Howard* (1992) 1 Cal.4th 1132, 1164 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) "[T]he 'inexactness and uncertainty' that characterize competency proceedings may make it difficult to determine whether a defendant is incompetent or malingering." (*Cooper v. Oklahoma, supra,* 517 U.S. at p. 365 [116 S.Ct. at p. 1382] ) Thus, "what constitutes . . . substantial evidence in a proceeding under section 1368 'cannot be answered by a simple formula applicable to all situations.' [Citation.]" (*People v. Laudermilk* (1967) 67 Cal.2d 272, 283 [61 Cal.Rptr. 644, 431 P.2d 228].) " '[S]ufficient present ability' " to cooperate with a lawyer and assist rationally in preparing a defense includes more than an "orientation as to time and place," and "some recollection of events is not enough." (*People v. Tomas* (1977) 74 Cal.App.3d 75, 88 [141 Cal.Rptr. 453].) Mere bizarre statements or actions are generally insufficient to constitute substantial evidence raising a doubt as to the defendant's competency. (*People v. Burney* (1981) 115 Cal.App.3d 497, 503 [171 Cal.Rptr. 329].) On the other hand, the testimony of one mental health professional that the defendant is unable to assist in his or her defense because of a mental defect constitutes substantial evidence sufficient to

compel a hearing. (*People v. Stankewitz* (1982) 32 Cal.3d 80, 92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476].) Where the substantial evidence test is satisfied, but the trial court fails to conduct a full hearing on competency, the judgment must be reversed. (*People v. Welch* (1999) 20 Cal.4th 701, 738 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

■ It is not essential for the defendant, his or her counsel, or the prosecutor to make a motion which raises the issue of the defendant's competence in order to permit consideration of the issue on appeal. (*People v. Tomas, supra,* 74 Cal.App.3d at p. 88; see also *People v. Aparicio* (1952) 38 Cal.2d 565, 568-569 [241 P.2d 221].) Rather, the presence of the requisite substantial objective evidence compels the trial court to sua sponte suspend proceedings and order a hearing, and the court's failure to do so in the face of such evidence is an act in excess of its jurisdiction and may be raised by the defendant on appeal from the judgment. (*Marks, supra,* 1 Cal.4th at p. 69; *People v. Tomas, supra,* 74 Cal.App.3d at p. 90.) The trial court's duty includes sua sponte reconsideration of pro se status where there is substantial evidence bringing the defendant's competency into doubt. (See *People v. Poplawski* (1994) 25 Cal.App.4th 881, 890-891 [30 Cal.Rptr.2d 760].)

B. *Analysis*

■ The People contend that the applicable standard of review is whether, from the trial judge's independent observations, there was substantial evidence sufficient to raise a suspicion that Roberta suffered a developmental disability. This essentially amounts to an argument that the standard for determining whether to appoint the director of the regional center for the developmentally disabled is a subjective one. However, case law establishes that the standard to be applied in determining whether to suspend proceedings and evaluate the defendant's competency is an objective one. (*People v. Tomas, supra,* 74 Cal.App.3d at p. 90.) If there is sufficient doubt the defendant may be developmentally disabled, and the suspicion appears on the record as a matter of law, if the trial court fails to proceed in accordance with section 1369, an abuse of discretion is shown, and a reversal is required. (See *Marks, supra,* 1 Cal.4th at p. 68; *People v. Aparicio, supra,* 38 Cal.2d at p. 568.)

■ Competence cannot be waived, and the court has the initial and primary duty to act when the facts demonstrate the defendant's possible incompetency; it is the failure of the trial court to raise the issue and suspend proceedings, not the failure of defense counsel to raise the issue, which constitutes the jurisdictional error. (See *People v. Howard, supra,* 1 Cal.4th

at pp. 1163-1164; *People v. Pennington, supra,* 66 Cal.2d at p. 521; *Pate v. Robinson* (1966) 383 U.S. 375, 384 [86 S.Ct. 836, 841, 15 L.Ed.2d 815].) Although the reported cases address incompetency based on mental disease, we see no reason why the same standards and principles should not apply to cases of incompetency based on developmental disability, since the statutes are equally applicable to both types of incompetence.

In the case presently before us, counsel in fact raised the issue and provided the trial court with a supplemental declaration, which was filed on April 2, 1997, stating that Roberta had difficulty understanding what was communicated to her; that Roberta "cannot work with me;" and that Huffman believed Roberta may be incompetent. Huffman's declaration further stated Roberta's family had provided Huffman with evidence of Roberta's developmental disability, specifically the report from the state Department of Rehabilitation reflecting Roberta had a "most severe" disability. The report was attached as an exhibit to the declaration. As a matter of law, this evidence constituted substantial, objective evidence sufficient for the court to declare a suspicion, or doubt, that Roberta was developmentally disabled and to appoint the director of the regional center for the developmentally disabled to evaluate Roberta. (See *People v. Frye* (1998) 18 Cal.4th 894, 952 [19 Cal.4th 253d, 77 Cal.Rptr.2d 25, 959 P.2d 183].) Substantial evidence is evidence that raises a reasonable doubt. (*People v. Howard, supra,* 1 Cal.4th at p. 1163.)

The trial court in this case, however, ignored the substantial, objective evidence that Roberta had a developmental disability, impermissibly substituted its own subjective observations for the requirements of the statute, and declined to appoint the regional center director to conduct an evaluation as specifically requested by the defense. The developmentally disabled, however, range from those whose disability is not immediately apparent to those requiring constant care. Thus, we leave it to the Legislature, guided by competent professionals, to determine how such a diverse group shall be treated. (*Cardinal v. Santee Pita, Inc.* (1991) 234 Cal.App.3d 1676, 1682 [286 Cal.Rptr. 275].) The Legislature, in its wisdom, sought to address the rights of just such defendants by providing that developmental disabilities be assessed only by qualified individuals, specifically the regional center director. (§ 1369, subd. (a).) When there is substantial evidence that gives rise to a suspicion that a defendant is developmentally disabled, the defendant may be committed to an approved residential facility for evaluation, but *must* be evaluated by the regional center for the developmentally disabled. (5 Witkin, Cal. Criminal Law (2d ed. 1989) Trial, § 3002, pp. 3681-3682.)

Once the trial court had before it substantial evidence that raised a suspicion that Roberta was developmentally disabled, the trial court was

*required* under section 1369, subdivision (a), to appoint the director of the regional center for the developmentally disabled to evaluate Roberta. The trial court was then *required*, before proceeding to rule on competency, to consider the report of the regional center director. (§ 1369, subd. (a).) Because there is a presumption of competence to stand trial, and the burden is on the defendant to rebut the presumption by a preponderance of the evidence (*People v. Masterson* (1994) 8 Cal.4th 965, 973 [35 Cal.Rptr.2d 679, 884 P.2d 136]; § 1369, subd. (f)), the trial court's failure to comply with the requirements of the statute precluded Roberta from obtaining the necessary evaluation that may have established her incompetence. The failure of the trial court to comply with the statutory requirements affects the fundamental integrity of the court proceedings. (*People v. Harris* (1993)14 Cal.App.4th 984, 995 [18 Cal.Rptr.2d 92].)

That the trial court twice appointed psychiatrists to evaluate Roberta's competence to stand trial does not satisfy the requirements of the statute; the trial court was required by law to appoint the regional center director to conduct an evaluation. (§ 1369, subd. (a).) Other courts faced with a potentially developmentally disabled defendant have appointed both a psychiatrist *and* the regional center director to evaluate the defendant. (See *People v. Kelly* (1992) 1 Cal.4th 495, 541-542 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

Further, neither Dr. Velosa nor Dr. Burdick, the court-appointed psychiatrists, made any attempt to determine Roberta's intelligence level or assess the extent of her developmental disability. Both merely described her as having some unspecified learning disability based upon Roberta's statements that she had been in special education classes. It is clear from their reports that both Dr. Velosa's and Dr. Burdick's examinations of Roberta focused on whether she had any mental disease or mental illness, which is an entirely separate basis for a finding of incompetency than developmental disability. (§ 1367.)

Having failed to proceed *properly* with a competency hearing, the trial court acted in excess of its jurisdiction. (*Marks, supra,* 1 Cal.4th at p. 56.) ■ We recognize the general rule on appeal is that a finding of competence to stand trial cannot be disturbed if there is any substantial and credible evidence in the record to support the finding. (*People v. Hightower* (1996) 41 Cal.App.4th 1108, 1111 [49 Cal.Rptr.2d 40].) However, this standard of review will be applied only when the proper procedures for determining competency have been followed; in this case they were not. The state having adopted specific procedures to be followed in dealing with potentially developmentally disabled defendants, the trial court is obligated to see that a defendant is able to avail himself or herself of those procedures. ■ As the United States Supreme Court has noted, placing the burden on a defendant to show incompetence does not violate due process when: (1) a state has

adopted procedures for determining competence; and (2) the defendant has been provided access to those procedures. (*Medina v. California* (1992) 505 U.S. 437, 449 [112 S.Ct. 2572, 2579, 120 L.Ed.2d 353].) Roberta was denied the access to which she was legally entitled.

That subsequent hearings were conducted to determine competency and to withdraw the plea does not remedy the problem. Again, at the second competency hearing, despite objective evidence of a possible developmental disability, the trial court did not appoint the regional center director. Whether the appointment of the regional center director was specifically requested at the second competency hearing or not is irrelevant; when a doubt exists, the trial court must "take the initiative in obtaining evidence on that issue." (*In re Davis* (1973) 8 Cal.3d 798, 808 [106 Cal.Rptr. 178, 505 P.2d 1018].) At no time did Roberta receive the proper competency hearing to which she was legally entitled. (See *In re Dennis* (1959) 51 Cal.2d 666, 672 [335 P.2d 657].)

When the relevant statutes set forth a specific procedure to be followed in determining whether a defendant is competent to stand trial, and those procedures have not been adhered to, the fundamental integrity of the court's proceedings has been compromised. Due process *requires* that any doubt regarding the defendant's competency be properly evaluated by experts prior to proceeding with trial. (*People v. Harris, supra,* 14 Cal.App.4th at p. 995.)

## CONCLUSION

We must reverse both the sentence and the adjudication of guilt. There was no evaluation of the extent of Roberta's developmental disability by the regional center director at any time prior to her plea or sentencing. Without such an evaluation, and a consideration of that evaluation prior to ruling on competency, all subsequent proceedings are invalid because the trial court acted in excess of its jurisdiction. (See *Marks, supra,* 1 Cal.4th at p. 56.)

In determining how to proceed, the California Supreme Court has adopted the view that the United States Supreme Court "accept[s] the possibility of a constitutionally adequate posttrial or even postappeal evaluation of the defendant's pretrial competence." (*Marks, supra,* 1 Cal.4th at p. 67.) In the case presently before us, however, a determination that Roberta was competent to stand trial does not resolve the matter. Roberta must not only be competent to stand trial in the sense that she has the mental capacity and ability to understand the nature and object of the proceedings against her (*Drope v. Missouri* (1975) 420 U.S. 162, 171 [95 S.Ct. 896, 903-904, 43

L.Ed.2d 103]), because she entered a plea, it also must be found that she had the mental ability to knowingly and voluntarily waive her constitutional rights. While this is not a heightened standard of competence, it is a heightened standard that must be satisfied in order to permit a defendant to enter a guilty plea. (*Godinez v. Moran* (1993) 509 U.S. 389, 400-401 [113 S.Ct. 2680, 2687-2688, 125 L.Ed.2d 321].) Inherent in the acceptance of a plea is that there must be a factual basis for the plea, which in turn requires that the defendant have the mental capacity and ability to form the necessary intent at the time the crime was committed.

In *Drope v. Missouri, supra,* 420 U.S. at page 183 [95 S.Ct. at page 909], the court said: "The question remains whether petitioner's due process rights would be adequately protected by remanding the case now for a psychiatric examination aimed at establishing whether petitioner was in fact competent to stand trial in 1969. Given the inherent difficulties of such a *nunc pro tunc* determination under the most favorable circumstances, see *Pate v. Robinson,* 383 U.S., at 386-387 [95 S.Ct. at pp. 842-843]; *Dusky v. United States* [(1960)], 362 U.S. [402,] 403 [80 S.Ct. 788, 789, 4 L.Ed.2d 824] we cannot conclude that such a procedure would be adequate here. Cf. *Conner v. Wingo* [(6th Cir. 1970)] 429 F.2d [630,] 639-640. The State is free to retry petitioner, assuming, of course, that at the time of such trial he is competent to be tried."

As in *Drope,* we cannot conclude that a nunc pro tunc determination of competency will suffice. Therefore, we reverse unconditionally. Should the Kern County District Attorney elect to retry Roberta, the trial court is on notice that it has a sua sponte duty to declare a doubt as to her competence based upon a possible developmental disability that may impair her ability to understand the nature of the proceedings or assist counsel in the conduct of a defense in a rational manner.

We note that Roberta has an IQ of 46 to 69, depending upon which type of intelligence test is used. We do not in this opinion hold that this defendant, or any defendant of this IQ level, is incompetent as a matter of law. We hold only that when there is substantial, objective evidence that the defendant may suffer from a developmental disability, the defendant's competence to stand trial cannot be ruled upon until at a minimum, the director of the regional center for the developmentally disabled has evaluated the defendant, submitted a report, and the trial court has considered that report as required by section 1369.

In light of our decision to reverse unconditionally, it is unnecessary to address any other issue raised by the parties in their briefs on appeal.

## DISPOSITION

The judgment is reversed. The petition for writ of habeas corpus is denied as moot.

Dibiaso, Acting P. J., and Harris, J., concurred.

A petition for a rehearing was denied April 11, 2000, and the opinion was modified to read as printed above.