Filed 7/16/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE WILLIAM LARA,<br><br>    Defendant and Appellant. | F086534<br><br>(Super. Ct. No.  BF189541A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Chad A. Louie and Michael G. Bush, Judges.[‡]

Jake Stebner and Jacquelyn E. Larson, under appointments by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Jose William Lara was convicted by a jury of first degree murder and sentenced to 25 years to life.  During pretrial proceedings, defense counsel raised a doubt as to Lara's competency to stand trial, prompting the trial court to suspend criminal

---

[‡] Judge Louie found Lara competent to stand trial; Judge Bush was the trial judge.

proceedings and appoint a psychologist for evaluation. The psychologist observed "extremely low" intelligence, confusion during two prior police interviews and during the competency evaluation, and scores below the cutoff on all three sections of a test designed to assess incompetence due to intellectual disability. Nevertheless, the psychologist concluded Lara was competent to stand trial. At the competency hearing, the parties submitted on the report without additional evidence, and the trial court found Lara competent to stand trial based on the report. Criminal proceedings resumed.

On appeal, Lara contends the trial court mishandled the procedures for determining his competency to stand trial. He argues there was sufficient evidence of intellectual disability, a type of developmental disability, to trigger the trial court's duty to appoint "the director of the regional center [for the developmentally disabled] … , or the director's designee, to examine the defendant[.]" (Pen. Code,[1] § 1369, subd. (a)(2).) We conclude the trial court was presented with evidence raising sufficient doubt that Lara was intellectually disabled and was thus obligated to appoint the regional center director, or the director's designee, to examine Lara. (*Ibid*; *People v. Castro* (2000) 78 Cal.App.4th 1402, 1416 (*Castro*), disapproved on other grounds in *People v. Leonard* (2007) 40 Cal.4th 1370, 1389, 1391 & fn. 3 (*Leonard*).) The court's failure to do so was prejudicial error, and we accordingly reverse the judgment. We thus need not address Lara's other claim that the trial court erred by refusing his request for a jury instruction on "third-party flight" in support of his third-party culpability theory.

## STATEMENT OF THE CASE

In May 2022, the Kern County District Attorney charged Lara in an information with a single count of first degree murder (§§ 187, subd. (a), 189). The information also alleged nine aggravating factors (Cal. Rules of Court, rule 4.421). A jury convicted Lara

---

[1] Subsequent statutory references are to the Penal Code unless stated otherwise.

of first degree murder and found true four aggravating factors.  On June 16, 2023, the trial court sentenced Lara to 25 years to life in prison.

## FACTS

### I.  Underlying incident

In early January 2012, Desiree Thompson disappeared from California City shortly after a violent encounter with her husband, Edward Gibson.  Law enforcement opened a missing person's investigation but could not locate either Thompson or Gibson.  Around that time, Lara—who lived in California City and had attended church with J.M., Sr.—separately confessed to both J.M., Sr. and his teenage son, J.M., Jr., that he had killed a woman who accepted a ride and a beer at his home after he was ejected from a party.  Lara described striking the woman's head against a refrigerator, stabbing her with a modified screwdriver, and burying her in his backyard.  During the confession, J.M., Sr. saw blood on the wall and carpet of Lara's bedroom, as well as a dented, broken refrigerator—consistent with Lara's account.  In 2022, prompted by a social media post from Thompson's mother, J.M., Sr. and J.M., Jr. reported Lara's confession to law enforcement.  A search of Lara's former property uncovered human remains, DNA evidence, and personal items consistent with Thompson's identity.

### II.  Competency proceedings

In April 2022, Lara pleaded not guilty to the criminal complaint charging him with murder.  After he was held to answer after a preliminary hearing, the information was filed on May 17, 2022.  Lara pleaded not guilty to the information on May 23, 2022.

On October 21, 2022, Lara's counsel informed the trial court of a doubt regarding Lara's competency to stand trial.  Criminal proceedings were subsequently suspended, and the court appointed Dr. Tristan Engles to examine Lara.  Due to circumstances beyond Dr. Engles's control that prevented him from evaluating Lara in a timely manner, the trial court on November 15, 2022, appointed Dr. Gary Longwith, a psychologist, to conduct the examination and prepare a report.

The letterhead of Dr. Longwith's report stated he was a medical psychologist, clinical psychologist, and clinical psychopharmacologist. But the report provided no information about Dr. Longwith's professional background, including any training or experience in evaluating defendants for competency to stand trial or in working with people with developmental disabilities.

Dr. Longwith reviewed the transcripts of two interviews Lara had with police. The first interview, conducted on May 6, 2022, produced a 48-page transcript. Dr. Longwith stated Lara "was easily confused by questions, and the interrogation was at times confusing as a result. However, the [transcript] did not provide other information that suggested an altered mental status and/or behavior I deemed relevant to the PC 1368 evaluation." As to the second interview, conducted on May 9, 2022, and producing a 74-page transcript, Dr. Longwith said, "Like the earlier interview and interrogation there was frequent confusion. However, there was no other information in the document that suggested an altered mental status and/or behavior I deemed relevant to the PC 1368 evaluation."[2]

At the beginning of Dr. Longwith's evaluation of Lara, Lara stated he did not know the reason for the evaluation, but he appeared to understand once Dr. Longwith shared the reason. Lara "fully engaged" Dr. Longwith during the evaluation, and "[h]e was fully cooperative, respectful, and all indications are, he did his best to be genuine during [the evaluation]." However, Dr. Longwith stated, "Cognitively [Lara] had some difficulty understanding questions, and that required frequent clarifications."

As an adult, Lara was employed mainly in construction related vocations. He denied ever having been diagnosed or treated for a mental health condition and denied current treatment at the jail. He had begun using marijuana 20 years prior, and he used it daily after work to calm himself and help with sleep. Also, over the prior 20 years, he

_____

[2] Transcripts of these police interviews are not in the appellate record.

4.

used alcohol on weekends. He was married to his wife for over 25 years until her death from cancer in 2011. He then was in a brief relationship with a woman for a year. He had never fathered children.

Dr. Longwith administered to Lara the Wechsler Abbreviated Scale of Intelligence II (WASI-II), "a short and reliable measure of intelligence in clinical settings." Lara's "estimated intellect was deemed 65 which is in the extremely low range."

Dr. Longwith also administered the Competence Assessment for Standing Trial (CAST-MR), which is designed to assess competency to stand trial in individuals with intellectual disability. This assessment consisted of 50 questions in three sections. The first section tests the defendant's understanding of basic legal terms, the second tests their ability to assist in their own defense, and the third section involves open-ended questions about the defendant's specific case. "The Mean cut-off Raw Scores for persons who are intellectually disabled and competent to stand trial are:" 18.3 for the first section, 10.7 for the second, and 8.0 for the third. "The mean total score for MR-Competency is 37.0." Lara's raw scores on the three sections, respectively, were 17, 10, and 7, for a total raw score of 34. Dr. Longwith's opinion was that Lara, despite his raw scores below the cutoffs, "has the cognitive ability to rationally understand the basic legal concepts, how to assist his attorney, and to understand case events; the problem is, he is not likely familiar with the terminology. A brief conversation with his attorney about these legal issues and concepts, is all that is needed to educate [Lara]."

Dr. Longwith diagnosed Lara with substance abuse disorder. In summary, Dr. Longwith stated there were "no obvious indication[s] of psychopathology, mood dysregulation, psychosis, or delusional processes." He said Lara's "intellect was deemed extremely low, and that was consistent with his minimal formal education."[3] He

---

[3] The report does not say how much formal education Lara had.

concluded that Lara's CAST-MR scores, which were "just below the cutoff for competence," reflected "a lack of familiarity with some terms and concepts, and it was not due to cognitive deficits and/or mental health problems." His opinion was that Lara had "the rational ability to understand such concepts, terms, and information about his case, if such is provided to him by his attorney. He does not require a formal admission to an inpatient program to teach him." His ultimate conclusion was that Lara was competent to stand trial.

At the hearing to determine the issue of competency, the parties submitted on Dr. Longwith's report without offering any other evidence or comments. The court found Lara competent to stand trial based on the report without further comment, and criminal proceedings were reinstated.

## DISCUSSION

Lara contends the trial court erred by failing to appoint the regional center director, or their designee, to examine him despite being presented with evidence raising a sufficient doubt that he was intellectually disabled. He argues the omission was prejudicial as it deprived him of his right to a fair competency trial. We agree.

The criminal trial of an incompetent defendant violates the due process clause of the federal and state Constitutions. (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354 [116 S.Ct. 1373, 1376] [defendant may not be put to trial unless he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding of the facts and proceedings against him]; *Timothy J. v. Superior Court* (2007) 150 Cal.App.4th 847, 857.) Following this principle, section 1367 provides: "A person shall not be tried or adjudged to punishment … while that person is mentally incompetent. A defendant is mentally incompetent … if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

6.

Section 1368 instructs the trial court that if "a doubt arises in the mind of the judge as to the mental competence of the defendant," the judge shall so state on the record and "inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent." (§ 1368, subd. (a).) "If counsel informs the court that they believe the defendant is or may be mentally incompetent," or upon its own motion, "the court shall order that the question of the defendant's mental competence is to be determined" in a hearing. (*Id.*, subd. (b).) "[W]hen an inquiry into the present mental competence of the defendant has been commenced by the court all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined." (*Id.*, subd. (c).)

Section 1369 sets forth the procedures for determining the question of the defendant's mental competency. The court must "appoint at least one licensed psychologist or psychiatrist to examine the defendant's mental condition." (§ 1369, subd. (a)(1).) If it is suspected the defendant has a developmental disability, the court must appoint the director of the regional center[4] or the director's designee to examine the defendant to determine whether he or she has a developmental disability, as defined in section 4512 of the Welfare and Institutions Code, and is therefore eligible for its services and supports. (§ 1369, subd. (a)(2).) The "director or their designee shall provide the court with a written report informing the court of this determination." (*Ibid.*)

"Developmental disability" is defined as "a disability that originates before an individual attains 18 years of age, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual." (Welf. & Inst. Code, § 4512,

---

[4] Regional centers provide the services to which people with developmental disabilities are entitled under the Lanterman Developmental Disabilities Services Act. (Welf. & Inst. Code, §§ 4500–4846; *Medina v. Superior Court* (2021) 65 Cal.App.5th 1197, 1204, fn. 1 (*Medina*).) They are operated by private nonprofit community agencies. (Welf. & Inst. Code, § 4620; *Medina*, at p. 1204, fn. 1.)

7.

subd. (a)(1).)  The term includes "intellectual disability, cerebral palsy, epilepsy, and autism," as well as "disabling conditions found to be closely related to intellectual disability or to require treatment similar to that required for individuals with an intellectual disability[.]"  (*Ibid.*)

The standard for appointing the director is an objective one that is satisfied when "there is sufficient doubt the defendant may be developmentally disabled, and the suspicion appears on the record as a matter of law[.]"  (*Castro, supra,* 78 Cal.App.4th at p. 1416.)  "Sufficient doubt" does not require affirmative proof of developmental disability; rather, it is met when the record contains facts that raise a reasonable question about whether the defendant is developmentally disabled.  (See *id.* at p. 1415.)[5]  This standard safeguards the defendant's due process rights by ensuring that uncertainty alone triggers the statutory procedures for further assessment by a qualified expert.

After the defendant has been examined, if neither party objects to any competency report submitted, the court may determine the defendant's competency solely on any such report.  (§ 1369, subd. (c)(1).)  But "if either party objects to any competency report and requests a hearing, the court shall hold a hearing to determine competence[.]"  (§ 1369, subd. (c)(2).)  The court may decide the issue, or, upon request, submit the question of competency to a jury.  (§ 1369, subd. (c)(4).)  If the defendant is found competent to stand trial, criminal proceedings resume.  (§§ 1370, subd. (a)(1)(A), 1370.1, subd. (a)(1)(A).)  If the defendant is found incompetent, the court must commit the defendant to

---

[5] This definition of "sufficient doubt" derives from *Castro*'s explanation of "substantial evidence" in a related context.  The *Castro* court explained:  "Although section 1368, subdivision (a), refers to a doubt that arises 'in the mind of the judge as to the mental competence of the defendant,' case law interpreting this subdivision establishes that when the court becomes aware of substantial evidence which objectively generates a doubt about whether the defendant is competent to stand trial, the trial court must on its own motion declare a doubt and suspend proceedings[.]"  (*Castro, supra,* 78 Cal.App.4th 1402, 1415.)  The court added:  "Substantial evidence of mental incompetence is evidence that raises a reasonable doubt on the issue."  (*Id.* at p. 1416.)

8.

a state hospital or other treatment facility designated for the purpose of restoring competency. (§§ 1370, subds. (a)(1)(B)(i)(I), (a)(1)(C)(i), 1370.1, subd. (a)(1)(A)(i).) When the defendant is incompetent due to a "mental health disorder," section 1370 governs the proceedings. (§ 1367, subd. (b).) By contrast, section 1370.1 applies where a person is incompetent as a result of a developmental disability or is incompetent as a result of a mental health disorder and also has a developmental disability.[6] (§ 1367, subd. (b).)

Our Supreme Court has explained that section 1369's requirement of an evaluation by the director of the regional center serves three purposes. First, it helps the trial court determine where the defendant should be confined pending the competency determination. (*Leonard, supra,* 40 Cal.4th at p. 1389.) Second, it helps the court decide where the defendant should be confined if found incompetent. (*Ibid.*) Finally, and most relevant for our purposes, it "ensure[s] that a developmentally disabled defendant's competence to stand trial is assessed by those having expertise with such disability…. 'A valid assessment of a criminal defendant's ability to stand trial requires a [ ] comprehensive, individualized examination of the defendant's ability to function in a court proceeding. A reliable assessment is achieved through thorough examinations of each individual by experts experienced in development disabilities.' A regional center … is 'the primary agency to provide expert advice relating to the assessment, needs, and

---

[6] If a defendant is found mentally incompetent due to a developmental disability, criminal proceedings are suspended and the court commits the defendant to a state hospital, developmental center, or other approved residential facility to help them attain competence. (§ 1370.1, subd. (a)(1)(B)(i).) Sometimes, the defendant may be placed on outpatient status. (§ 1370.1, subd. (a)(1)(B)(i).) The facility is selected based on a recommendation from the regional center. (§ 1370.1, subd. (a)(2).) The commitment can last for up to two years, or until the defendant becomes competent, whichever comes first. (§ 1370.1, subd. (c)(1)(A).) If the defendant is still incompetent after two years, the court may dismiss the charges or refer the case for civil commitment. (§ 1370.1, subd. (c)(2).)

abilities of a criminal defendant with developmental disabilities.' Court-appointed psychiatrists and psychologists may not have this expertise, because their experience may pertain to mental illness rather than developmental disability." (*Id.* at pp. 1389–1390, fn. omitted.) As to this third purpose, other courts have recognized that developmental disability is not a form of mental disorder. (See *In re Williams* (2014) 228 Cal.App.4th 989, 1009–1010; *Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 487 ["The developmental disability that may result in mental incompetence is different from the mental disorder that may also have that result."].)

Lara contends, and we agree, that the trial court erred in failing to appoint the director of the regional center, or their designee, to evaluate Lara for developmental disability. This conclusion is compelled by the evidence before the trial court that raised a sufficient doubt that Lara was intellectually disabled. Dr. Longwith's report revealed an "extremely low" IQ of 65, documented Lara's confusion during police interviews and the competency evaluation, and showed scores below the competence cutoff on all three parts of the CAST-MR, thereby triggering the trial court's duty to appoint the regional center director, or their designee, for evaluation. That Dr. Longwith ultimately opined that Lara was competent does not negate the existence of evidence raising sufficient doubt, nor does it eliminate the trial court's corresponding duty. As long as there was such sufficient doubt, the appointment of the regional center director was not discretionary but required.

Respondent cites *People v. Taylor* (2009) 47 Cal.4th 850, where the California Supreme Court rejected a capital defendant's contention that the trial court was obliged to have him examined by the regional center director. There, a doubt was declared as to the defendant's competency, and two appointed experts evaluated him. (*Id.* at p. 859.) One of the experts, Flach, "administered several tests, including two intelligence tests, and also interviewed [the] defendant." (*Id.* at p. 860.) Flach found the defendant knew the roles of the judge and attorneys and understood his charges and potential punishment.

Flach found " 'no acute psychotic thought disorders' from his examination, but found defendant seemed 'somewhat grandiose at times[.]'" (*Ibid.*) The defendant also displayed a " 'rather narcissistic perspective' " and had an " 'almost … delusional conviction regarding the nature of his insight.' " (*Ibid.*) "Flach observed these personality traits could be related to [the] defendant's 'long history of cocaine dependence.' " (*Ibid.*)

As to intellectual functioning, the *Taylor* defendant's verbal IQ score was 75, placing him in the " 'borderline range.' " (*Taylor, supra,* 47 Cal.4th at pp. 860–861.) Flach found his abilities were "borderline in understanding of the world, vocabulary and memory, and low average in math skills." (*Ibid.*) Overall, the defendant had " 'low average to borderline intelligence, with severe deficits noted in common sense reasoning and abstract thinking abilities.' " (*Id.* at p. 861.) These deficits were " 'consistent' with [the] defendant's history of substance abuse." (*Id.* at p. 861.) "Flach concluded [the] defendant understood the nature and purpose of the proceedings, but 'may have difficulty in rationally cooperating with coun[sel], due to his tendency to become somewhat defensive and distrusting.' " (*Ibid.*)

The parties submitted on the psychologist's reports, and the trial court found the defendant competent to stand trial. (*Taylor, supra,* 47 Cal.4th at p. 861.) On appeal, he argued the trial court erred by not appointing the regional center director because Flach's testing showed a verbal IQ score of 75. (*Id.* at p. 864.) The Supreme Court disagreed, stating that Flach's report "nowhere referred to any possibility of a developmental disability." (*Ibid.*) Instead, Flach attributed the defendant's "relatively low intelligence" and difficulty with common-sense reasoning to his history of substance dependence. Consequently, Flach's opinion was not one "that would cause the trial court to 'suspect[ ] the defendant is developmentally disabled.' " (*Ibid.*)

*Taylor* is inapt on its facts. The *Taylor* defendant's IQ score of 75, placing him in the "borderline range," was significantly higher than Lara's "extremely low" score of 65. Additionally, Lara scored below the cutoff scores for competence on a test (the CAST-

11.

MR) designed to assess competency to stand trial in individuals with intellectual disability; the *Taylor* opinion, conversely, contains no such indication for its defendant. The *Taylor* opinion also does not state that Flach reported the defendant ever becoming confused or having difficulty understanding questions, behaviors Dr. Longwith observed in Lara. These factual disparities between Lara's presentation and the circumstances described in *Taylor* make any reliance on that case misplaced.

We turn next to the question of prejudice. "The erroneous failure to appoint the director of the regional center does not require reversal unless the error deprived the defendant of a fair competency trial." (*People v. Townsel* (2016) 63 Cal.4th 25, 37; citing *Leonard, supra,* 40 Cal.4th at p. 1390.) In *Leonard*, the defendant was charged with multiple counts of murder when the trial court declared a doubt as to his competency to stand trial. (*Leonard*, at pp. 1376, 1385.) The court appointed two doctors to evaluate him, but did not appoint the regional center director even though the court was aware that the defendant suffered from epilepsy, a condition rendering him developmentally disabled. (*Id.* at pp. 1387–1389.) The defendant was found competent in a court trial and subsequently convicted by a jury of the murders. (*Id.* at pp. 1376, 1385–1387.)

On automatic appeal to the California Supreme Court, the defendant argued his convictions must be reversed because of the trial court's failure to appoint the regional center director. (*Leonard, supra,* 40 Cal.4th at pp. 1387–1388.) The court first observed that epilepsy falls within the statutory definition of "developmental disability," and thus held the trial court erred when it did not appoint the regional center director to examine the defendant, as required by section 1369. (*Leonard*, at p. 1388.)

The *Leonard* court next held the error was not prejudicial. The court's holding was based on the third purpose of section 1369's requirement of an evaluation by the regional center director, which was the only one relevant there: "to ensure that a developmentally disabled defendant's competence to stand trial is assessed by those who have expertise with such disability." (*Leonard, supra,* 40 Cal.4th at p. 1389.) However,

12.

reversal of the defendant's convictions was not required because that purpose had been satisfied. The court stated: "[T]he trial court's competency determination was based on evidence from experts who were familiar with defendant's developmental disability and who considered it in evaluating his competence. Dr. Schaffer, the court-appointed psychiatrist who testified that defendant was competent to stand trial, was a professor at the University of California at Davis School of Medicine and a diplomat of the American Board of Psychiatry and Neurology. Even though he did not specialize in epileptic patients, he had observed patients who had seizures similar to those of defendant. Similarly, Dr. Lynch, the neuropsychologist who testified for the defense, had treated many epileptic patients, although his primary area of expertise pertained to head injuries, not epilepsy."[7] (*Id.* at p. 1390.)

*Leonard* explained: "[A]ppointment of the director of the regional center for the developmentally disabled … is intended to ensure that a developmentally disabled defendant is evaluated by experts experienced in the field, which will enable the trier of fact to make an informed determination of the defendant's competence to stand trial. Here, defendant was evaluated by doctors who possessed these qualifications, and their testimony provided a basis for the trial court's ruling that defendant was competent to stand trial. Thus, the court's failure to appoint the director of the regional center to examine defendant did not prejudice defendant." (*Leonard, supra,* 40 Cal.4th at p. 1391, fn. omitted.)

The circumstances here differ from those in *Leonard*. The California Supreme Court's finding of no prejudice in *Leonard* rested on the fact that the competency determination there was informed by experts who, while not specialists in the defendant's specific developmental disability (epilepsy), possessed sufficient relevant experience,

---

**[7]** Dr. Lynch did not give an opinion on Leonard's competency. (*Leonard, supra,* 40 Cal.4th at pp. 1386–1387.)

with one having observed patients with similar seizures and the other having treated many epileptic patients—a crucial distinction absent here. Here, evidence raising sufficient doubt that Lara was intellectually disabled was presented, yet the record does not demonstrate that Dr. Longwith possessed the necessary expertise to determine whether Lara indeed suffered from such a disability and, if so, whether it rendered him incompetent to stand trial. His report identifies him only as a psychologist, offering no insight into his training or experience in evaluating defendants with intellectual disability or understanding the unique ways such disability can impact competency to stand trial. This critical absence of demonstrated expertise distinguishes this case.

While Dr. Longwith identified Lara's "extremely low" IQ and noted other signs of low intellectual functioning, recognizing low intelligence is distinct from possessing the specialized knowledge required to assess whether an individual meets the criteria for a developmental disability and, critically, how that disability impairs their ability to understand legal proceedings and assist in their defense. Even a layperson might observe low intelligence based on behavior or test scores, but that superficial observation alone does not equate to the expertise needed to diagnose intellectual disability and analyze its implications on legal competency—expertise that a regional center director possesses.

Assessing whether a defendant presents with intellectual disability that affects their competency demands an evaluation that goes beyond mere observations and test scores. It requires knowledge of how such disability interacts with the defendant's capacity to grasp legal concepts, comprehend court proceedings, and effectively collaborate with their attorney. This requires specialized knowledge of how the disability influences cognition, behavior, and decision-making within a legal context.

Here, the record provides no basis for attributing such expertise to Dr. Longwith. His conclusion that Lara's low CAST-MR scores were due to lack of familiarity with legal terms rather than "cognitive deficits" was offered without any discernable foundation in expertise related to intellectual disability. Similarly, his opinion that Lara

14.

needed only a "brief conversation with his attorney" to understand basic legal terms and concepts also lacked foundation. Dr. Longwith's report does not say if he even tried explaining any such concepts to Lara. Thus, the record does not show there was a reliable expert assessment of whether Lara is developmentally disabled and, if so, whether that disability rendered him incompetent to stand trial. (*Leonard, supra,* 40 Cal.4th at p. 1389 [reliable assessment requires thorough examination by expert experienced in developmental disabilities].) Therefore, the trial court's finding that Lara was competent to stand trial lacks a sufficient basis.

Citing *Leonard*, the People argue that the trial court's competency determination was adequately supported because "Dr. Longwith was familiar with the tests that he administered to [Lara], and he considered those scores in evaluating [Lara's] competence." (See *Leonard, supra,* 40 Cal.4th at p. 1390 ["[T]he trial court's competency determination was based on evidence from experts who were familiar with defendant's developmental disability and who considered it in evaluating his competence."].) However, in our view, they misinterpret *Leonard*'s holding. As we have explained, *Leonard* found no prejudice because the evaluating experts were familiar with the defendant's developmental disability, not merely the tests they administered. An expert's familiarity with tests alone is insufficient; they must be familiar with the defendant's suspected developmental disability. In the context of *Leonard*, "familiar with" appears to go beyond simply noticing or acknowledging a fact. The term suggests an understanding that comes from expertise in the field, not just awareness of the information. The *Leonard* court emphasized the necessity of experts well versed in a disability, which implies that merely recognizing a defendant's low intelligence is not sufficient. Thus, the People's reliance on Dr. Longwith's awareness and consideration of

Lara's low intelligence, without evidence of expertise in intellectual disability, does not meet the standards set in *Leonard*.[8]

A conditional reversal is not an appropriate remedy here. In rare cases where a trial court erroneously fails to order competency proceedings at all, a retrospective competency hearing may be an appropriate remedy. (*People v. Gonzales* (2019) 34 Cal.App.5th 1081, 1088; see also *People v. Rodas* (2018) 6 Cal.5th 219, 238–239.) Such cases " 'involve[e] unusual circumstances where reliable evidence of the defendant's mental condition at the time of trial would be available at the hearing.' " (*Gonzales*, at p. 1088.) In these instances, the appellate court conditionally reverses the judgment and remands the matter for a determination of whether the defendant was competent at the time of trial. (*Gonzales*, at p. 1091.) If the trial court determines the defendant was competent, the judgment is reinstated. (*Ibid.*) But if the court determines the defendant was incompetent, a new trial is granted. (*Ibid.*)

"The key question in determining whether retrospective relief is feasible is whether there is sufficient evidence in the record to reliably determine the defendant's mental competence *at the time of his earlier trial*. [Citation.] In 'unusual circumstances' the record may include 'reliable evidence of the defendant's mental condition' at that earlier point in time. [Citation.] But where, as is typically the case, the defendant exhibits fluctuating symptoms, significant time has passed, or there is a lack of contemporaneous expert evaluations, reliable retrospective evaluation is simply not feasible." (*People v. Tejeda* (2019) 40 Cal.App.5th 785, 796.) Since there is no evidence that an expert qualified in developmental disabilities evaluated Lara back when his competency was being determined, a reliable retroactive evaluation is not possible.

---

**8** Our opinion is not intended in any way to denigrate Dr. Longwith's general expertise and qualifications. The issue is whether his specific expertise as set forth in the record satisfied the standards articulated in *Leonard*.

16.

In conclusion, no evidence showed Dr. Longwith had the required expertise to determine whether Lara was developmentally disabled and, if so, how that disability impacted his competency to stand trial. Thus, the failure to appoint the regional center director, or their designee, deprived Lara of a fair competency trial. We therefore reverse the judgment and remand the matter for a new trial.

**DISPOSITION**

The judgment is reversed and the matter is remanded for further proceedings.

SNAUFFER, J.

WE CONCUR:

PEÑA, Acting P. J.

MEEHAN, J.

17.