Filed 2/18/15  P. v. Jackson CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JONATHAN JAMES JACKSON,<br><br>    Defendant and Appellant. | F066062<br><br>(Super. Ct. No. F12900608)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Don Penner, Judge.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Jonathan James Jackson was sentenced to a term of seven years eight months in state prison following a no contest plea.  On appeal, defendant contends the

record does not support the trial court's ruling that he was competent to enter a plea because he suffered from a number of conditions recognized in a psychiatrist's report, and no other expert found him to be competent. Further, defendant maintains the trial court erred by not appointing the director of the regional center for the developmentally disabled after the psychiatrist's report provided substantial evidence of his incompetence on the basis of a developmental disability. Next, defendant argues the judgment should be reversed because the record shows he pled to a legal impossibility. In a related argument, he contends the matter should be remanded due to the legal inadequacy of the factual basis inquiry. Finally, defendant maintains the record establishes his plea was not knowing, voluntary, or intelligent. We find no error and will affirm the judgment.

## RELEVANT PROCEDURAL BACKGROUND[1]

A January 31, 2012, complaint alleged defendant had violated (1) Penal Code[2] section 422 by willfully and unlawfully threatening to commit a crime resulting in injury or death to Kimberly Hall, and (2) section 136.1, subdivision (a)(1), by dissuading Hall from giving testimony at a trial. Additionally, it was alleged defendant had been convicted of a prior serious felony and had served a prior prison term.

On May 18, 2012, defendant withdrew his previously entered not guilty pleas and pled no contest to the criminal threat count and admitted the associated allegations. Count 2 was to be dismissed and a potential sentence of seven years eight months was indicated by the court.

Prior to sentencing, however, doubts concerning defendant's competency were raised by defense counsel. Criminal proceedings were suspended and the court ordered a mental evaluation be prepared by a court-appointed physician.

Ultimately, the court found defendant to be competent and proceedings were reinstated. Thereafter, defendant was sentenced in accordance with his plea.

---

[1]The facts of the underlying crime will be recited where necessary in our discussion.

[2]Unless otherwise indicated, all further statutory references are to the Penal Code.

**DISCUSSION**[3]

## I.      The Evidence of Competency

Defendant challenges the trial court's ruling that he was competent, claiming the report of Harold L. Seymour, Ph.D., as the sole report, was uncontested.  As such, defendant asserts the trial court's ruling is subject to de novo review.  He points to various portions of Dr. Seymour's report to support his argument that there was ample evidence of his incompetence, including, but not limited to, certain developmental disabilities and anxiety.  We do not agree with defendant and find the evidence sufficient to support the trial court's ruling he was competent.

### A.      Applicable Legal Standards

A criminal defendant "cannot be tried or adjudged to punishment … while that person is mentally incompetent."  (§ 1367, subd. (a).)  "A defendant is mentally incompetent" if a mental disorder prevents the defendant from understanding "the nature of the criminal proceedings" or assisting counsel "in the conduct of a defense in a rational manner."  (*Ibid*.)  Section 1368 sets forth the procedure for implementing section 1367 protections.

More specifically, state law and federal due process bar the trial or conviction of a mentally incompetent defendant.  (*People v. Rogers* (2006) 39 Cal.4th 826, 846.)  Both

---

[3]Defendant's opening brief is 115 pages; his reply brief is 50 pages.  Each employs extensive headings and subheadings.  Nevertheless, this court will not respond in like fashion.

In *People v. Garcia* (2002) 97 Cal.App.4th 847, we noted an opinion that does not "establish a new rule of law, apply an existing rule to a set of facts significantly different from the facts involved in a published opinion, modify or criticize an existing rule of law, resolve or create an apparent conflict in the law, address a legal issue of continuing public interest, or make a significant contribution to the legal literature by reviewing either the development of a common law rule or the legislative or judicial history of a provision of a constitution, statute, or other written law," is one that "does not merit extensive factual or legal statement" and thus does not require "[a] meticulously crafted but unpublished legal essay, replete with extended analyses of law and expositions of reasoning and which distinguishes authorities and responds to every nuance of argument in the parties' briefs." (*Id.* at p. 851.)  This case does not warrant publication.  Further, the court will not devote its "limited human and material resources far out of proportion to the utility of the effort" required to determine the legal correctness of the trial court's ruling. (*Ibid*.)

"require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.]  The court's duty to conduct a competency hearing may arise at any time prior to judgment.  [Citations.]  Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations.  [Citations.]  But to be entitled to a competency hearing, 'a defendant must exhibit more than … a preexisting psychiatric condition that has little bearing on the question … whether the defendant can assist his defense counsel.'  [Citations.]" (*People v. Rogers*, *supra*, at p. 847.)

"Under California law, a person is incompetent to stand trial 'if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.'  (§ 1367, subd. (a).)"  (*People v. Young* (2005) 34 Cal.4th 1149, 1216; see *People v. Koontz* (2002) 27 Cal.4th 1041, 1063; see also *People v. Garcia* (2008) 159 Cal.App.4th 163, 170.)  "A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence."  (*People v. Lawley* (2002) 27 Cal.4th 102, 131; see § 1369, subd. (f).)

On appeal, the reviewing court conducts a deferential standard of review to determine whether substantial evidence supports the trial court's findings.  (*People v. Dunkle* (2005) 36 Cal.4th 861, 885, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Marshall* (1997) 15 Cal.4th 1, 31; *People v. Kaplan* (2007) 149 Cal.App.4th 372, 382–383; *People v. Castro* (2000) 78 Cal.App.4th 1402, 1418, disapproved on other grounds in *People v. Leonard* (2007) 40 Cal.4th 1370, 1391, fn. 3.)

## B.    The Relevant Proceedings

On July 13, 2012, defense counsel advised the court that he had a doubt as to defendant's competency.  The court suspended criminal proceedings and appointed Dr. Seymour to assess defendant.

Dr. Seymour evaluated defendant on August 7, 2012.  His confidential report was filed with the court on October 12, 2012.  The doctor concluded as follows:

> "**OPINION:**  Based on the results of this evaluation, it appears that [defendant] has entered into a plea agreement that he is unable to read.  He accepted the plea agreement knowing that it would result in 7 years in prison, despite his assertion that he has not committed any of the alleged crimes.
>
> "Based on [defendant]'s self-report, he chose to sign a plea agreement primarily to escape the recurrent anxiety and confusion he experiences when he is in the courtroom.  It appears to this examiner that this is an example of impaired reasoning as it relates to the settling of his criminal case.
>
> "[Defendant] processes a bit slowly and he will require a good deal of assistance in order to proceed with his case.  He does not presently appear competent due to his anxiety, which overwhelms his limited ability to exercise adequate reasoning skills.
>
> "[Defendant] would probably benefit from a psychiatric consultation for consideration of medication to manage his anxiety symptoms.  Some basic education about the criminal trial process would also be helpful in restoring [him] to competency.
>
> "**RECOMMENDATION:**  Based on the information gathered during this evaluation, it is respectfully recommended that the Court find [defendant] to be **not competent to stand trial**."

On October 12, 2012, the issue of defendant's competency was argued and submitted, and the court made its ruling thereafter:

> [DEFENSE COUNSEL]:  Your Honor, we are asking the court to find [defendant] not competent to stand trial based on Dr. [Seymour]'s report.  I do realize that there was a change of plea in this case and that he appropriately answered the questions when the court was going through that change of plea form, however I think that the evaluation by the doctor is accurate and that [defendant] is not competent to stand trial.  Your Honor, in my experience as a defense attorney, I believe that a lot of clients answer questions appropriately when they may not completely understand.  They answer questions appropriately, especially in cases where the client is truly 1368.  They may answer the right way but it doesn't necessarily mean that they were competent at the time.  He could have been told what answers to give.  I don't know what attorney took the plea in that case.  [¶] … [¶] But I don't believe that's necessarily dispositive of his

5.

competency and I believe that there should be great weight given to Dr. [Seymour]'s report and evaluation and recommendation and that he should be treated at a state hospital prior to proceeding.

"THE COURT: All right. Mr. [Prosecutor], do you want to be heard?

"[PROSECUTOR]: We'll submit, Your Honor. [¶] …[¶]

"THE COURT: Dr. [Seymour]'s report, which the Court has read and considered is dated the 7th of August, I believe, 2012. The doctor indicates that he reviewed the complaints, the plea form, jail medical records and I'll note for the record that there was no change of plea transcript at the time in the court file that [the doctor] could have reviewed. On page 2 of [his] report under the circumstances of the alleged offense and the prior legal categories, the doctor notes that the defendant's information was … historically accurate, that he knew that he was on misdemeanor probation, including a denial by the defendant during the interview, that he was guilty of the case for which he was on misdemeanor probation. He also indicated the defendant knew that he had a 2004, as he said, GTA conviction that was a strike. The court takes GTA to mean grand theft auto and given that his strike in 2004 was for 215 carjacking, I believe that is a reasonable characterization for a lay person to characterize that 215 as grand theft auto. The defendant indicated that he was in Special Ed classes during his education. He also said that he worked in home health care services as a provider for a number of years and his only disability was for asthma and back problems.

"On page 3, there's a reference to the fact that the defendant has had no contact with jail psychiatric services. The doctor indicated that the defendant's performance on the revised competency assessment instrument or the CAI was quote as he says mixed. The defendant did know his case could go to trial, he knew what a not guilty plea was, he knew what a no contest plea was. He did not know what a guilty plea was and he indicated that he understood plea bargaining.

"On page 4, the doctor opines concern about the decision by the defendant to accept a plea agreement and that he could not read but he does state that the revised competency assessment scores were quote, in his words, not especially weak. On page 3 again, he indicates the defendant thought the exposure on this case was 18 years when it was really a maximum I believe of 12.

"On page 3, Dr. [Seymour] indicates the defendant admitted a great deal of anxiety in the courtroom and that ultimately, this is the crux of Dr. [Seymour]'s opinion, that the defendant is incompetent. He diagnosed

6.

the defendant with an anxiety disorder not otherwise specified and that he had borderline intellectual functioning and I'll note for the record that I … believe most people in a courtroom have anxiety at the time that they make appearances in the courtroom.  He said that the defendant heard—told him at the evaluation that the defendant had heard his new attorney … tell the Judge that there is reason to believe that he, the defendant, did not understand what he was doing when he entered this no contest plea.

"On page 4, the doctor opines that the defendant pleaded because of his anxiety over coming to court and not because he viewed himself as guilty.  It is the court's opinion that this conclusion oversimplifies the options that the defendant had at the time of the change of plea.  Dr. [Seymour] also makes much of the Defendant's approach to any problem is to call someone to solve his problems and in the doctor's opinion this shows that the defendant, in his words, deferred, that's his words, defers when confronted with decisions about making—when confronted with a task of making decisions.  It is the court's observation that if you're a poor reader that seeking a verbal consultation from someone seems to be a reasonable option to me.  If a reader indicated that he would quote call the Internet or something characterized as seeking information on the Internet, I don't perceive that as to be some evidence that the defendant or that individual would be deferring to someone else's opinion just because they're seeking information from another source.  [Defendant], because he cannot read according to Dr. [Seymour]s' verbal opinions would seem to me to be appropriate for him.

"The doctor's opinion that the defendant is incompetent to stand trial is in the court's opinion equivocal.  He says [defendant] processes a bit slowly and he will require a good deal of assistance in order to proceed with this case.  He does not presently appear competent due to his anxiety which overwhelms his limited ability to exercise adequate reasoning skills.

"On page 3 of the … doctor's report, the doctor reports the defendant did not know what a jury was.  On page 2 of the change of plea transcript, the defendant indicated he had not been through a jury trial which was not an answer to a yes or no question, which seemed to … indicate to me that the defendant does have some understanding of what a jury trial was and that that contradicts the … statement that the defendant made to Dr. [Seymour] that he did not know what a jury trial included.

"On page 8, he also said in the change of plea transcript that he had read and understood the form.  That was in response I believe to a yes or no question and I do understand the argument by … [defense counsel] that individuals are sometimes programmed during a change of plea hearing to answer questions in a robotic fashion.  While there is some support in the

court's mind to question whether the defendant should or should not have entered this no contest plea, I think that is really what [the doctor]'s report is about. And to some extent, that opinion has some relevance to the issue of competency that anyone can always second-guess a plea bargain decision from either side of the aisle and while Dr. [Seymour] thinks this may have been a bad decision that was caused by the defendant's anxiety for the courtroom, there is another consideration which I believe [the doctor] did not consider or discuss in his report which was the defendant's exposure on this charge. The presumption in this hearing is that the defendant is competent.

"The court makes a finding there is insufficient evidence to meet the burden of proof which is a preponderance of the evidence that the defendant is not competent. For those reasons, the court makes a finding that he is competent. Criminal proceedings are reinstated."

## C.    Our Analysis

Initially, we note the report prepared by Dr. Seymour concerned defendant's then-present competency. The report does not amount to a finding that defendant was not competent at the time he entered his no contest pleas.

In any event, the trial court was not required to accept Dr. Seymour's opinion, uncontradicted though it may have been, that defendant was incompetent. A trial court may properly assess the weight and persuasiveness of the expert's report. (*People v. Lawley*, *supra*, 27 Cal.4th at p. 132.) It may not arbitrarily disregard, however, an expert's uncontradicted recommendation. (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1509.)

The issue of defendant's competency was submitted for decision on the basis of Dr. Seymour's report alone. Although the doctor did not testify "under oath with particularity that, because of mental illness, the [defendant] is incapable of understanding the proceedings or assisting in his defense" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1047), his report serves that purpose by virtue of the court's appointment. (*People v. Tomas* (1977) 74 Cal.App.3d 75, 91.)

Nonetheless, the trial court did not "arbitrarily disregard" Dr. Seymour's recommendation. Rather, the court indicated why it chose not to accept the doctor's

8.

opinion, specifically identifying portions of the report it believed were lacking in support or were otherwise inconsistent. Viewing the evidence in the light most favorable to the trial court's finding defendant was competent reveals substantial and credible evidence in support of that finding.

For but one example, the trial court noted that despite the doctor's "mixed" finding following the competency assessment instrument report, defendant was aware "his case could go to trial," and that a defendant could plead guilty or no contest to charges. Defendant also understood plea bargaining, the basic roles of courtroom personnel, and the fact a defendant may not be compelled to testify. A review of the doctor's report also reveals defendant understood the difference between a misdemeanor and a felony as he advised the doctor he was "on misdemeanor probation following a plea deal," and he had a previous conviction amounting to a "felony strike." It also reveals defendant understood the purpose behind a restraining order, alleging he "avoided all contact with [the victim] following the July 2011 case." This amounts to substantial and credible evidence defendant does not suffer from a mental disorder preventing him from understanding the nature of the criminal proceedings or from assisting counsel in his defense.

Another example concerns the trial court's comments regarding Dr. Seymour's diagnostic impression defendant suffers from an anxiety disorder not otherwise specified. As the trial court noted, defendant "admitted a great deal of anxiety" in the courtroom, yet that is a common response to persons making similar appearances. Other than defendant's self-reported anxiety, there is no other evidence to indicate defendant has an anxiety disorder. Defendant also reported to Dr. Seymour he was in good health, he was not taking any prescribed medications, and he denied any history of "mental health problems or treatment." He did "acknowledge some history of anger" when frustrated, but also indicated his mood was "generally fine." The "Jail Medical records" reviewed by Dr. Seymour did not include any reference to an anxiety disorder and revealed defendant "has had no contact with Jail Psychiatric Services." Even assuming defendant

suffers from an anxiety disorder, that fact does not require a finding of incompetence. Rather, the issue is whether defendant is able to understand the proceedings against him and/or assist his attorney. (§ 1367, subd. (a).) On this record, there is sufficient evidence to support the trial court's finding defendant was competent.

Lastly, we note the trial court could properly consider its own observations of defendant on previous occasions as well. (*People v. Lawley*, *supra*, 27 Cal.4th at p. 136.) It can be reasonably inferred from the trial court's references to defendant's responses during the change of plea proceeding that the court had no concerns as to defendant's ability to understand the proceedings or his ability to assist defense counsel on that occasion.

In sum, we find the trial court's ruling to be supported by substantial and credible evidence.

## II.     Incompetence Due to Developmental Disability

Defendant contends that, even assuming arguendo there is evidence of defendant's competence, because there is "also significant evidence of incompetence" due to a developmental disability, the trial court was required to appoint the director of the regional center for the developmentally disabled pursuant to section 1369, subdivision (a). We hold otherwise.

Section 1369 requires the trial court to refer a defendant to the director of the regional center "[i]f it is suspected the defendant is developmentally disabled …." To prevail on this claim, defendant must show Dr. Seymour's report provided substantial evidence he was developmentally disabled. (*People v. Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1047; *People v. Castro*, *supra*, 78 Cal.App.4th at pp. 1416-1418.) "Substantial evidence is evidence that raises a reasonable doubt" on the issue. (*People v. Castro*, *supra*, at p. 1417.)

A developmental disability, for the purpose of determining mental competence, is defined as "a disability that originates before an individual attains age 18, continues, or can be expected to continue, indefinitely and constitutes a substantial handicap for the

individual, and shall not include other handicapping conditions that are solely physical in nature. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include handicapping conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals …." (Former § 1370.1, subd. (a)(1)(H).[4]) Mental retardation is "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18." (Former § 1376, subd. (a); see fn. 4, *ante*.) "'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." (*Atkins v. Virginia* (2002) 536 U.S. 304, 308, fn. 3, citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) pp. 42–43.) The California Legislature, however, "has chosen not to include a numerical IQ score as part of the definition of 'mentally retarded.'" (*In re Hawthorne* (2005) 35 Cal.4th 40, 48.)

Here, after administering the "Revised Competency Assessment Instrument," the "Reading Scale of the Wide Range Achievement Test—Revised … [and] the Judgment items from the Cognistat" test, Dr. Seymour's diagnostic impression included borderline intellectual functioning at Axis II. Defendant does not suffer from cerebral palsy, epilepsy or autism. And significantly, Dr. Seymour's report does not use either the term "mentally retarded" or "developmentally disabled" to describe defendant. The doctor's finding is somewhat equivocal given his statement in the "Mental Status Exam" portion of his report that defendant "*appears* to be functioning in the Borderline range of intelligence." (Italics added.) Additionally, the doctor's report refers to his findings on the Revised Competency Assessment Instrument as "mixed" and "not especially weak."

---

[4]Effective January 1, 2013, the term "mental retardation" in sections 1370.1 and 1376 was replaced by the term "intellectual disability" without substantive change in the definitions. (Stats. 2012, ch. 457, § 1.)

11.

Thus, the doctor's own findings do not amount to sufficient evidence in support of his diagnostic impression and the opinion that follows.

The fact defendant may "process[] a bit slowly," was in special education classes, or even read at a second grade level does not amount to "a substantial handicap" triggering appointment of the director of the regional center. Further, Dr. Seymour's report notes he was "allowed to examine [defendant]'s Jail Medical records," but the doctor did not indicate those records included any particular finding or test related to defendant's intellectual functioning amounting to a developmental disability. It can be inferred from Dr. Seymour's findings defendant did not suffer from a substantial mental handicap given his completion of a high school education and ability to maintain employment providing home health care services to his mother for a number of years.

We acknowledge defendant's complaints on appeal that Dr. Seymour had no particular expertise in the area of developmental disability. Yet, it is significant to note both parties stipulated the court could make its competency determination solely on the basis of Dr. Seymour's report. Hence, defendant should not now be heard to complain about the doctor's qualifications or lack thereof. (Cf. *People v. Gurule* (2002) 28 Cal.4th 557, 623 [generally, a party entering into voluntary stipulation is precluded on appeal from arguing defects relating to that stipulation].) Furthermore, we note defense counsel's argument prior to the trial court's competency ruling does not suggest the court should find a developmental disability or even address a developmental disability. Rather, the focus of counsel's argument was on defendant's ability to understand the criminal proceedings and, in particular, his ability to understand the questions posed to him during the change of plea hearing and to answer those questions accordingly.

In *People v. Castro*, *supra*, 78 Cal.App.4th 1402, the defendant was charged with murder and various other crimes. At defense counsel's request, the trial court appointed a psychotherapist to examine her to determine if her mental condition might be the basis for a defense. (Evid. Code, § 1017.) The psychotherapist submitted a report saying the defendant was developmentally disabled. Counsel therefore asked the court to appoint

12.

the director of the regional center to examine her. (§ 1369, subd. (a).) The court denied the request without prejudice based on its own observation the defendant did not seem to be disabled. Counsel later renewed the request, supported this time by a report from the Department of Rehabilitation indicating the defendant had a "'most severe'" developmental disability. Instead of appointing the director of the regional center to examine her, the court appointed a psychiatrist who reported the defendant had an unspecified learning disability, but no psychiatric disorder. (*People v. Castro*, *supra*, at pp. 1410-1411.)

The defendant then pleaded no contest to second degree murder in exchange for dismissal of the other charges. Shortly afterward, however, she moved to withdraw her plea and to replace her attorney. The court granted the second request but not the first. The new attorney filed another section 1368 competency motion. Once again the court appointed a psychiatrist rather than the director of the regional center. This psychiatrist said essentially the same thing as the first one: the defendant had an unspecified learning disability but no psychiatric disease. (*People v. Castro*, *supra*, 78 Cal.App.4th at p. 1412.)

The defendant then filed another motion to withdraw her plea on the ground she had been unable to understand the consequences. A clinical psychologist testified in support of the motion that he had tested the defendant and determined she had an IQ between 55 and 65. He opined on this basis the defendant had not been mentally competent to enter her no contest plea. One of the psychiatrists who had examined her earlier testified in opposition to the motion that, while the defendant had a learning disability, he had found no evidence of mental retardation. The court denied the motion. (*People v. Castro*, *supra*, 78 Cal.App.4th at p. 1412.)

At sentencing, the defendant submitted evidence in mitigation consisting of school records indicating she functioned at a second or third grade level and had been identified as mentally retarded. She also included records from the Department of Rehabilitation saying she had an IQ of 61 and was classified as mentally retarded with "'neurological

deficits.'"  Notwithstanding this evidence, the court sentenced her to a term of 15 years to life in prison.  (*People v. Castro*, *supra*, 78 Cal.App.4th at p. 1413.)

This court held the opinion of a mental health professional that the defendant was mentally incompetent constitutes substantial evidence sufficient, as a matter of law, to trigger the court's duties under section 1368.  The court may not substitute its own subjective opinion about a defendant's mental condition for such objective evidence.  We held further that when the condition appears to be the result of a developmental disability, the court must appoint the director of the regional center, or the director's designee, to examine the defendant.  (*People v. Castro*, *supra*, 78 Cal.App.4th at pp. 1415-1418.)

In *Castro*, there was abundant evidence the defendant had a developmental disability.  Here, in contrast, there is no such evidence.  In *Castro*, the trial court improperly substituted its own inexpert assessment of the defendant's condition for that of several professionals.  That is not the case here.  It appears defendant's argument confuses a developmental disability with a learning disability.  They are not the same thing.  There may be sufficient evidence of a learning disability, but the same cannot be said of a developmental disability.

We disagree with defendant's contention there was substantial evidence of incompetence due to a developmental disability that obligated the court to appoint the regional director pursuant to section 1369.

In any event, we conclude defendant was not prejudiced by the trial court's failure to appoint the director to evaluate him because any error did not deprive defendant of a fair trial to determine his competency.  (*People v. Leonard*, *supra*, 40 Cal.4th at pp. 1390–1391.)  As we explained above more fully, the trial court determined defendant had a rational and factual understanding of the nature of the legal proceedings and the ability to assist in his defense.  Further, Dr. Seymour's report, although concluding defendant was incompetent, did not find defendant suffered from any developmental disability.  Thus, he was not prejudiced by the court's failure to appoint the director of the regional center.

## III.    A Plea to a Legal Impossibility

Next, defendant asserts it is legally impossible to violate section 422 with "a conditional threat" "contingent upon a nonexistent event."  As a result, he contends reversal is required.

### A.    Case No. F11904321

Defendant initially entered pleas of not guilty in an earlier action to one felony count of criminal threats (§ 422) and one misdemeanor count of vandalism (§ 594, subd. (a)(2)); this earlier matter concerned the same victim—Kimberly Hall—and the crimes were alleged to have occurred on July 10, 2011.

According to the probation report prepared in the instant matter, and more specifically to Fresno Police Department crime report No. 11-48907, defendant threatened to "'beat [the victim's] ass and burn [her] house down'" after the victim knocked on his mother's door and told him they were no longer friends.  On that same occasion, the defendant broke the kitchen window at the victim's residence with a stick.

On January 26, 2012, defendant agreed to withdraw his earlier not guilty pleas in light of the People's offer, wherein the felony criminal threat count would be reduced to a misdemeanor pursuant to section 17, subdivision (b).  The trial court accepted defendant's no contest plea to each misdemeanor violation alleged and set the matter for sentencing to be heard on February 16, 2012.

### B.    Case No. F12900608

According to the probation report, and in particular Fresno Police Department crime report No. 12-7061, on January 28, 2012, defendant shouted profanities at the victim as she passed him in the apartment complex.  When the victim returned from picking up her child at a nearby park, defendant was standing in front of her apartment door.  He again shouted profanities at the victim, adding "she needed to 'watch her back' and if she testified against him on January 30, 2012, that he would 'kick her ass.'"  Defendant also threatened to burn her apartment down.  He continued to use profanities,

15.

but eventually left the area.  There was a witness to these events and defendant directed profanities to the witness as well.

### C.     Our Analysis

Here then, before sentencing could be held in the earlier case and only two days after he entered no contest pleas in that matter, defendant was alleged to have committed the instant crimes against the same victim:  criminal threats (§ 422) and dissuading a witness from giving testimony (§ 136.1, subd. (a)(1)).

Defendant argues that because he pled no contest in the earlier case (F11904321), and because of those no contest pleas there would be no trial in that matter, it was legally impossible for him to have committed the criminal threat of January 28, 2012, wherein he threatened to physically harm Kimberly Hall and to "burn … down" her apartment if she were to testify against him on January 30, 2012.  We do not agree.

An appellant may successfully assert his or her admission, guilty plea, or no contest plea included a legal impossibility.  (*People v. Soriano* (1992) 4 Cal.App.4th 781, 783.)  In *Soriano*, the defendant pleaded guilty to violating section 115 by attempting "to file a 'forged instrument, to wit, a death certificate.'"  (*People v. Soriano*, *supra*, at p. 783.)  However, a death certificate is not an "instrument" within the meaning of section 115.  (*Soriano*, at p. 783.)  The Court of Appeal reversed the judgment, explaining: "[W]hat we have here is a legal impossibility.  [The defendant] could not have been guilty of violating … section 115 by attempting to file a forged instrument because, as a matter of law, the writing he was charged with and admitted forging, a death certificate, is not an instrument within the meaning of section 115."  (*Id*. at p. 784.)

In *People v. Jerome* (1984) 160 Cal.App.3d 1087, the defendant entered a negotiated plea of guilty to charges of oral copulation of a minor under age 14 in violation of section 288a, subdivision (c).  (*People v. Jerome*, *supra*, at p. 1093.)  On appeal, the Attorney General conceded the victim was actually 15 years old at the time of the crime and not 14 as required by the statute (*ibid*.), meaning the defendant could not

16.

have been guilty of oral copulation of a minor under the age of 14; it was legally impossible.

> "The elements of the completed crime [of criminal threat] are: (1) The defendant willfully threatened to commit a crime that will result in death or great bodily injury to another person. (2) The defendant had the specific intent that the statement be taken as a threat. (3) The threat was on its face and under the circumstances '"so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat."' (4) The threat caused the victim '"to be in sustained fear for his or her own safety or for his or her immediate family's safety."' (5) The victim's fear was reasonable under the circumstances." (*People v Jackson* (2009) 178 Cal.App.4th 590, 596.)

By his plea, defendant admitted (1) willfully threatening to commit a crime against Hall that would result in great bodily injury or death, (2) he had the specific intent to do so, (3) the threat was unequivocal, immediate and specific, and (4) it caused Hall to be in sustained, reasonable, fear for her safety. None of aforementioned elements require a follow through of the threat. Said another way, whether defendant could have carried through with his threat because, procedurally speaking, it could not have happened as he threatened, does not amount to a legal impossibility.

Defendant contends it is "legally impossible for a person to have 'knowledge' of something nonexistent." He claims the "knowledge the crime he is threatening will result in death or great bodily injury" is missing as a matter of law because he "threatened to commit a crime against [the victim] that was legally impossible because it was based on a contingency that could never happen." However, the record on appeal does not support his premise.

Although the docket report associated with case No. F11904321 in an entry dated January 26, 2012, reads: "Tentative Jury Trial date of 01/30/2012 is vacated," it is significant the reporter's transcript for the change of plea proceedings does not reflect the court vacated that January 30th trial date in defendant's presence. It is silent on the issue. The only date mentioned in the reporter's transcript from that proceeding is the date selected for sentencing: February 16, 2012. From this record, it can be inferred

17.

defendant was not aware the January 30 court proceedings in F11904321 had been vacated and was thus operating under the assumption Hall could still be testifying against him in some manner on that date. Thus, the record does not support defendant's argument he had knowledge his actions fell outside the statute.

Further, defendant asserts his threat "could not possibly come to pass due to the self-negating condition" of the threat—that it "could not have come to pass because Kimberly couldn't have testified against him on January 30," and it "could never have caused death or great bodily injury, because it could not have been carried out." Therefore, the willfulness element did not exist "due to the impossibility of the allegedly threatened crime from a self-negating condition."

A threat is to be viewed under the surrounding circumstances under which it was made. (*People v. Butler* (2000) 85 Cal.App.4th 745, 753; *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1218.) Here, defendant's threats to beat Hall and to burn down her residence if she testified against him were accompanied by defendant's physical presence outside the entrance to her apartment and his profane tirade. Those threats were made after defendant's previous and similar threats directed toward Hall and after she had already testified at a preliminary hearing about those previous threats. Again, we note the reporter's transcript in case F11904321 pertaining to the change of plea does not reference the January 30, 2012, proceeding. Moreover, we agree with the People that willfulness by defendant can be inferred from his words, for it seems he, like Hall, believed her testimony would be taken on January 30; defendant told the victim she "needed to 'watch her back' and if she testified against him on January 30, 2012, that he would 'kick her ass.' Then, the defendant told the victim he would 'burn the place down,' referring to her apartment."

Significantly, the criminal threat statute does not concentrate on the precise words of the threat. It focuses on the effect on the victim. (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1158.) The communication of the threat and the prospect of its execution "are as surely conveyed to a victim when the threatened harm is conditioned on

an occurrence guaranteed to happen as when the threat is absolutely unconditional." (*Ibid.*)  Hence, whether the threat was conditioned upon a future court appearance referenced by defendant at that time is not the proper focus.  Rather, the focus is on Hall. As previously noted, there is no evidence Hall was aware her testimony would not be required on January 30, 2012, in case No. F11904321.  In fact, there is evidence to the contrary.  The probation report reflects Hall "contacted police and advised them that she was in the process of testifying against the defendant regarding another criminal threat case.  She had already testified at the Preliminary Hearing, and she was scheduled to testify on January 30, 2012."  Hence, the legal impossibility, as argued by defendant, was certainly not known to Hall, the victim and focus of defendant's crime.

Defendant's admission to making criminal threats against Hall, including a threat to beat her and burn down her home if she were to testify against him on January 30, 2012, is readily distinguishable from the admission at issue in *Soriano*.  Legal impossibility involves a situation wherein "no assailant could commit the crime charged." (*People v. Jerome*, *supra*, 160 Cal.App.3d at p. 1093.)  In *Soriano*, no defendant could commit the crime of forgery by attempting to file a death certificate because a death certificate is not an instrument for purposes of section 115.  (*People v. Soriano*, *supra*, 4 Cal.App.4th at p. 784.)  Unlike *Soriano*, this case does not involve a situation wherein no defendant could commit the crime charged.  Rather, the crime of making a criminal threat could be committed by a defendant willfully threatening to commit a crime resulting in death or injury, with the specific intent the statement be taken as a threat, which on its face conveyed a gravity of purpose and immediate prospect of execution, causing the victim to be in reasonable, sustained fear for her safety.

In conclusion, we find defendant did not plead to a legal impossibility, therefore, reversal is not warranted.

## IV.    The Adequacy of the Factual Basis

Related to the previous argument, defendant maintains this matter should be remanded because the stipulated factual basis of the plea "offers nothing as a factual basis

that (i) recipient of the alleged threat was placed in sustained fear, and (ii) even if she had been, that any such sustained fear was reasonable." The People contend the factual basis inquiry was adequate.

Recently, in *People v. Palmer* (2013) 58 Cal.4th 110, the Supreme Court explained:

> "When a trial court takes a conditional plea of guilty or nolo contendere (hereafter no contest) to an accusatory pleading charging a felony, under … section 1192.5 it must 'cause an inquiry to be made of the defendant to satisfy itself that the plea is freely and voluntarily made, and that there is a factual basis for the plea.' '"The purpose of the requirement,"' we have said, '"is to protect against the situation where the defendant, although he realizes what he has done, is not sufficiently skilled in law to recognize that his acts do not constitute the offense with which he is charged."' (*People v. French* (2008) 43 Cal.4th 36, 50.) In *People v. Holmes* (2004) 32 Cal.4th 432 (*Holmes*), we held the trial court can satisfy this requirement by inquiring of defense counsel regarding the factual basis of the plea, in which case, we said, 'it should request that defense counsel stipulate to a particular document that provides an adequate factual basis, such as a complaint, police report, preliminary hearing transcript, probation report, grand jury transcript, or written plea agreement.' (*Id.* at p. 436, citing *People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1576–1579.) We did not need to address in *Holmes*, and expressly left open, the question whether section 1192.5 is satisfied when counsel stipulates to a factual basis for the plea without referring to a particular document that provides an adequate factual basis. (*Holmes*, *supra*, at p. 441, fn. 8.)" (*People v. Palmer*, *supra*, 58 Cal.4th at pp. 112–113, fn. omitted.)

*Palmer* provided an opportunity for the Supreme Court "to answer the question left open in *Holmes*, *supra*, 32 Cal.4th 432: whether [defense] counsel's bare stipulation, without reference to any document describing the underlying facts, sufficiently establishes a factual basis for the plea." (*People v. Palmer*, *supra*, 58 Cal.4th at p. 114.) The court's conclusion was that "a bare stipulation without reference to any document describing the facts may, in an appropriate case, satisfy the requirements of section 1192.5." (*Ibid.*) The court explained the defendant "acknowledged in the plea colloquy that he had discussed the elements of the crime and any defenses with his counsel and was satisfied

20.

with her advice"; therefore "the trial court did not abuse its discretion in finding a factual basis for defendant's no contest plea based on counsel's stipulation." (*Ibid*.)

The *Palmer* court further explained:

"'[A] trial court possesses wide discretion in determining whether a sufficient factual basis exists for a guilty plea. The trial court's acceptance of the guilty plea, after pursuing an inquiry to satisfy itself that there is a factual basis for the plea, will be reversed only for abuse of discretion.' [Citation.] We see several reasons to accord trial courts flexibility in establishing a factual basis for the plea, without undermining the primary goal of assuring that the defendant entered the plea voluntarily and intelligently. A defendant may be factually guilty but still hesitate to stipulate to the truth of an entire document like a police report that contains details he or she either disputes or simply does not want to admit. If there is no stipulated sentence, counsel may fear the police reports will demonstrate the existence of aggravating factors that could cause the court to impose a higher sentence, or to reject the plea bargain altogether. In sensitive cases involving intrafamilial violence and abuse, a defendant may wish to avoid having confidential information about the victim become part of the public record in the case. Although, as defendant notes, a factual basis does not require recitation of detailed and damaging facts concerning the crime, and counsel may place on the record only facts that support a prima facie case [citation], a rule limiting trial courts' discretion to accept conditional pleas predicated on stipulations by counsel would raise potential concerns for the defense function. In particular, defense counsel may advise acceptance of a plea agreement based in part on admissions the client has made or on other defense investigation, and may rely on such admissions or investigation in stipulating to the factual basis for a plea. We will not read into section 1192.5 a requirement that counsel explicitly refer to those privileged sources as the basis for the stipulation." (*People v. Palmer*, *supra*, 58 Cal.4th at pp. 118-119.)

In this case, the trial court performed its obligation to satisfy itself defendant's plea was freely and voluntarily made, as evidenced by the following:

"THE COURT: Do you see this brown—or tan change of plea waiver of rights form I'm holding in my left hand?

"THE DEFENDANT: Yes.

"THE COURT: Did you sign and initial this form?

"THE DEFENDANT: Yes.

21.

"THE COURT:  Did your lawyer go over the form with you?

"THE DEFENDANT:  Yes.

"THE COURT:  Do you believe you understand the contents of this form?

"THE DEFENDANT:  Yes.

"THE COURT:  [Defense counsel], are you satisfied your client understands the nature and terms of this plea agreement or indicated by the Court as well as the rights that he is giving up to enter this plea?

"[DEFENSE COUNSEL]:  Yes."

It can be reasonably inferred from this exchange that defense counsel discussed with defendant the elements of the crime to which he pled no contest, as well as any defenses he may have had thereto.  Therefore, defendant's assertion that "nothing in this record states" his attorney "discussed the elements of the crime and any defenses with him" is misguided.

Thereafter, the court elicited defendant's waiver of his rights (1) to a jury trial or court trial, (2) to confront witnesses against him, (3) to present evidence in his behalf, (4) to remain silent, and (5) to a preliminary hearing.  A short time later, defendant stated he understood he was admitting a violation of section "422 mainly referred to as criminal threats."  Before accepting defendant's plea, the court inquired of defendant:

"THE COURT: Do you have any questions you want to ask [defense counsel] privately?  That's the young lady standing next to your lawyer—or the Court on the record before I start taking your pleas.  Do you want a moment to speak to her about something?

"THE DEFENDANT:  Yeah.

"THE COURT:  I'll give you a moment.  The record will reflect [defendant] is speaking [with defense counsel] off the record.  Have you had enough time to discuss this with your attorney?

"THE DEFENDANT:  Yes.

"THE COURT:  Are you ready to proceed?

22.

"THE DEFENDANT: Yes.

"THE COURT: To the allegation in Count 1 of the Complaint … on or about January 28 of this year 2012 you committed felony violation of … Section 422 commonly referred to as criminal threats. The allegation is that on or about that date you did willfully and unlawfully threaten to commit a crime which crime would result in death or great bodily injury to one Kimberly Ann Hall. The allegation is that when you made that threat—that specific intent that the statement be taken as a threat. It's further alleged that the threat on its face and under the circumstances under which it was made was so unequivocal, unconditional and immediate and specific so as to convey to Ms. Hall a gravity of purpose and immediate prospect of execution. In other words, that it would be done immediately. *It is further alleged that Ms. Hall was reasonably in sustained fear for her safety or the safety of her immediate family.* Do you understand this allegation in Count 1? This is a felony and a strike ….

"THE DEFENDANT: Yes.

"THE COURT: How do you plea to Count 1? Guilty? Not guilty? Or no contest?

"THE DEFENDANT: No contest." (Italics added.)

Thereafter, both parties "join[ed] in the waivers and concur[red] and stipulate[d] to factual basis on the plea based on exchange of police reports with the DA's Office." Like the defendant in *Palmer*, at no time during these proceedings did defendant protest his factual innocence.

Here, also like *Palmer*, both counsel, as officers of the court, stipulated to the factual basis of the plea, specifically identifying the police report as providing that basis. Our record does not include the police report. Rather, the record only includes reference to the police report by way of the probation report.[5] We do agree the probation report's

---

[5]The probation report provides as follows from the police report:

"On January 28, 2012, at approximately 3:20 p.m., Kimberly H. (age 34) was walking to Eldorado Park to pick up her child who was playing at the park. When she approached the mailbox area of her apartment complex, she saw the defendant standing there. As she walked past the defendant, he yelled profanities at her. He yelled something regarding going to court. The victim ignored the defendant and continued walking to get her child.

23.

reference to the police report does not address facts directly relating to the victim's fear. Nevertheless, the probation report does indicate that in response to defendant's actions on January 28, 2012, Hall "contacted police and advised them that she was in the process of testifying against the defendant in another criminal threat case … and she was scheduled to testify on January 30, 2012."

Defendant argues that although the record does not contain the police report, because the probation report is a part of the record and it references the police report, which fails to address the victim's fear, the factual basis is inadequate. A probation report is required to include information concerning the circumstances of defendant's crime (§ 1203). But the statute does not require the report to identify all facts or statements corresponding to the elements of a defendant's crime. Similarly, the California Rules of Court require a probation report to include "information concerning the victim," however, a "victim's statement or a summary thereof" is required "*if available*." (Cal. Rules of Court, rule 4.411.5(a)(5)(A), italics added; see also 3 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Punishment, § 631, p. 1029 ["The report may include a statement of the victim's comments concerning the offense"].)

We conclude the adequacy of the factual basis for defendant's plea is sufficient. Defendant affirmed he had discussed the case with his attorney and was afforded another

"When she returned, she observed the defendant standing in front of her apartment door. The defendant again yelled profanities toward the victim. He told the victim she needed to 'watch her back' and if she testified against him on January 30, 2012, that he would 'kick her ass.' Then, the defendant told the victim he would 'burn the place down,' referring to her apartment. The defendant continued to yell profanities at the victim and left the area.

"The victim contacted police and advised them that she was in the process of testifying against the defendant regarding another criminal threat case. She had already testified at the Preliminary Hearing, and she was scheduled to testify on January 30, 2012.

"A witness told officers that he was inside of the residence when he heard yelling. As he exited the apartment, he observed the defendant yelling at the victim. He heard the defendant threaten the victim and tell her he was going to 'kick her ass.' Then, he heard the defendant tell the victim not to testify in court. If she did, he would 'kick her ass' and burn down her apartment. The defendant was yelling profanities at him and the victim before leaving the location."

24.

opportunity to speak with her during the change of plea hearing.  Also, as officers of the court, both counsel stipulated there existed a factual basis for the defendant's plea to the crime of making a criminal threat.  That factual basis was identified as the police report.  There is no evidence on this record that the police report was inadequate.  Considering all of the foregoing, we find the trial court acted within its discretion in accepting defendant's plea.

## V.  The Validity of the Plea

Finally, defendant argues his plea to count 1 was not knowing, voluntary, or intelligent because he pled to a legal impossibility, the factual basis was inadequate, the dismissal of count 2 was an illusory consideration, and the trial court's recitation of the charge may have been difficult to understand and incomprehensible to an individual with similar disabilities.

"[A] plea is valid if the record affirmatively shows that it is voluntary and intelligent under the totality of the circumstances."  (*People v. Howard* (1992) 1 Cal.4th 1132, 1175.)  "[I]t was well established that a valid guilty plea presupposed a voluntary and intelligent waiver of the defendant's constitutional trial rights, which include the privilege against self-incrimination, the right to trial by jury, and the right to confront one's accusers."  (*Id*. at p. 1175.)  "'[T]he record must affirmatively disclose that a defendant who pleaded guilty entered his plea understandingly and voluntarily.' [Citation.]"  (*Howard*, at p. 1177.)  "The record must affirmatively demonstrate that the plea was voluntary and intelligent under the totality of the circumstances."  (*Id*. at p. 1178.)  "[E]xplicit admonitions and waivers still serve the purpose that originally led us to require them:  They are the only realistic means of assuring that the judge leaves a record adequate for review."  (*People v. Howard*, *supra*, at pp. 1178–1179.)

A plea is involuntary when induced by threats, misrepresentation, or improper promises.  (*Brady v. United States* (1970) 397 U.S. 742, 755.)  "A plea may be involuntary either because the accused does not understand the nature of the constitutional protections that he is waiving [citation], or because he has such an

incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt. Without adequate notice of the nature of the charge against him, or proof that he in fact understood the charge, the plea cannot be voluntary in this latter sense. [Citation.]" (*Henderson v. Morgan* (1976) 426 U.S. 637, 645, fn. 13.)

A no contest plea not made knowingly or intelligently is involuntary and has been obtained in violation of due process and cannot form the basis of a criminal conviction. (U.S. Const., 5th & 14th Amends.; *Henderson v. Morgan*, *supra*, 426 U.S. at pp. 644-645; *McCarthy v. United States* (1969) 394 U.S. 459, 466.) However, a defendant cannot attack his (no contest) plea merely because he "made what turned out, in retrospect, to be a poor deal." (*Bradshaw v. Stumpf* (2005) 545 U.S. 175, 186.)

Here, the record affirmatively demonstrates defendant knowingly and voluntarily agreed to plead no contest, and in doing so waived his rights to a jury trial, to confront his accusers, and to not incriminate himself. First, defendant executed the felony plea form, which set forth each of these rights, and in which he agreed that he understood its terms, had discussed them with his attorney, and voluntarily waived them. Second, defendant's attorney signed the same form indicating she was satisfied defendant understood these rights, had an opportunity to discuss them with her, and he understood the consequences of the plea. Third, at the plea hearing the trial court judge engaged in an oral inquiry as to whether defendant was pleading no contest and waiving his constitutional rights voluntarily and intelligently. Fourth, at the conclusion of this inquiry, the court accepted defendant's plea and found it was "freely and voluntarily entered" and that defendant had "knowingly, intelligently and expressly waived his statutory and Constitutional rights."

We have already determined defendant did not plead to a legal impossibility, nor was the factual basis for that plea inadequate. We have also determined defendant did not overcome the presumption of competence by proving a developmental disability. These findings also mean the dismissal of count 2 in exchange for defendant's no contest plea in count 1 was not an illusory consideration.

To conclude, we have considered the applicable law, the transcript of the plea colloquy, and the record.  In doing so, we find defendant's no contest plea to be voluntary, knowing, and intelligent.

## DISPOSITION

The judgment is affirmed.

 

_____

                                       PEÑA, J.

WE CONCUR:

 

_____

POOCHIGIAN, Acting P.J.

 

_____

DETJEN, J.

27.